P. C. PFEIFFER CO., INC., ET AL. *v.* FORD ET AL.

No. 78–425.   Argued March 20, 1979—Reargued October 1, 1979—Decided
November 27, 1979

Powell J., delivered the opinion for a unanimous Court.

*E. D. Vickery* reargued the cause for petitioners. With him on the briefs was *W. Robins Brice*.

*Peter Buscemi* reargued the cause for respondents, *pro hac vice*. *William C. Bryson* argued the cause for respondents on the original argument. With him on the brief for the federal respondent were *Solicitor General McCree, Laurie M. Streeter,* and *Joshua T. Gillelan II*. *Arthur L. Schechter* filed a brief for respondent Bryant.*

---

*Briefs of *amici curiae* urging reversal were filed by *David R. Owen* and *Francis J. Gorman* for the Alliance of American Insurers et al.; and by *Thomas D. Wilcox* for the National Association of Stevedores.

Briefs of *amici curiae* urging affirmance were filed by *Thomas W. Gleason* and *Herzl S. Eisenstadt* for the International Longshoremen's Association,

Mr. Justice Powell delivered the opinion of the Court.

The question in this case is whether two workers were engaged in "maritime employment," as defined by § 2 (3) of the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1425, as amended, 86 Stat. 1251, 33 U. S. C. § 902 (3), when they sustained injuries for which they seek compensation.

## I

On April 12, 1973, Diverson Ford accidentally struck the middle finger of his left hand with a hammer while working on a public dock in the Port of Beaumont, Tex. On the day of his injury, Ford was employed by the P. C. Pfeiffer Co. to fasten military vehicles onto railroad flatcars. The vehicles had been delivered to the port by ship a number of days before the accident, stored, and then loaded onto flatcars the day before. The flatcars would take the vehicles to their inland destination.

Ford was working out of the warehousemen's local on the day of the accident. Agreements between employers, the warehousemen's union, and the longshoremen's union limit the tasks that warehousemen may perform in the Port of Beaumont. Warehousemen may not move cargo directly from a vessel either to a point of rest in storage or to a railroad car. Nor may they move cargo from a shoreside point of rest directly onto a vessel. These jobs are reserved for longshoremen. App. 10–11.

On May 2, 1973, Will Bryant was injured while unloading a bale of cotton from a dray wagon into a pier warehouse. Bryant was working as a cotton header for the Ayers Steamship Co. in the Port of Galveston, Tex. Cotton arrives at the port from inland shippers and enters storage in cotton

AFL–CIO; and by *Norman Leonard* for the International Longshoremen's and Warehousemen's Union.

*Dennis Lindsay* and *Robert Babcock* filed a brief for Cargill, Inc., as *amicus curiae*.

compress-warehouses. The cotton then goes by dray wagon to pier warehouses where a driver and two cotton headers unload and store it. Longshoremen later move the cotton from the pier warehouses onto ships.

Contractual agreements between employers, the cotton headers' union, and the longshoremen's union distinguish the work that cotton headers may perform from the tasks assignable to longshoremen. Cotton headers may only load cotton off dray wagons into the pier warehouses or move cotton within a pier warehouse. Cargo moved directly from the ship to shoreside transportation, or directly from shoreside transportation to the ship, is handled solely by longshoremen. *Id.*, at 25, 48–49, 57–58, 60–61.

## II

Before 1972, neither Ford nor Bryant could have received compensation under the Longshoremen's and Harbor Workers' Compensation Act because his injury occurred on land. The pre-1972 Act was simply an effort to fill the gap in workmen's compensation coverage created by this Court's decision in *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205 (1917), which held that state compensation systems could not reach longshoremen injured seaward of the water's edge.[1] A single situs requirement in § 3 (a) of the Act governed the scope of its coverage. That requirement limited coverage to workers whose "disability or death result[ed] from an injury occurring upon the navigable waters of the United States (including any dry dock). . . ." 44 Stat. 1426. In light of *Jensen* and the limited purpose of the Act, the situs test was understood to draw a sharp line between injuries sustained over water and those suffered on land. Thus, in

---

[1] A State, however, could compensate a worker who was injured while engaged in "maritime but local" activity. See *Grant Smith-Porter Ship Co.* v. *Rohde,* 257 U. S. 469, 476–477 (1922); *Western Fuel Co.* v. *Garcia,* 257 U. S. 233, 242 (1921). See generally G. Gilmore & C. Black, The Law of Admiralty § 6–49 (2d ed. 1975).

*Nacirema Operating Co.* v. *Johnson,* 396 U. S. 212, 218–220 (1969), this Court held that the Act did not extend to injuries occurring on a pier attached to the land. Although the Court recognized that inequities might result from rigid adherence to the *Jensen* line, the Court concluded that "[t]he invitation to move that line landward must be addressed to Congress, not to this Court." 396 U. S., at 224.[2]

Congress responded with the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972 (1972 Act).[3] The Act now extends coverage to more workers by replacing the single-situs requirement with a two-part situs and status standard. The newly broadened situs test provides compensation for an "employee" whose disability or death "results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)." § 3 (a), 33 U. S. C. § 903 (a). The status test defines an employee as "any per-

---

[2] *Nacirema Operating Co.* v. *Johnson* denied compensation to three workers who attached cargo in railroad cars to ships' cranes for loading onto a vessel. When a loaded crane swung back toward land, the men were knocked onto a pier or crushed against a railroad car. A fourth case considered in the Court of Appeals along with the three cases consolidated in *Nacirema Operating Co.* vividly illustrated the arbitrariness of the *Jensen* line. The lower courts held that the Act covered a longshoreman who fell from his workplace on a pier into the water, where he drowned. See *Marine Stevedoring Corp.* v. *Oosting,* 238 F. Supp. 78 (ED Va. 1965), aff'd, 398 F. 2d 900 (CA4 1968) (en banc). The only difference between this longshoreman and the three workers in *Nacirema Operating Co.* was where his body fell. See *Nacirema Operating Co.* v. *Johnson,* 396 U. S., at 224–225 (Douglas, J., dissenting).

[3] 86 Stat. 1251. The primary purposes of the 1972 Amendments were to raise the amount of compensation available under the Act, to abolish the longshoremen's seaworthiness remedy against the owners of a vessel, and to outlaw shipowners' claims for indemnification from stevedores. *Northeast Marine Terminal Co.* v. *Caputo,* 432 U. S. 249, 261–262, and n. 18 (1977).

son engaged in maritime employment, including any long-shoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker. . . ." § 2 (3), 33 U. S. C. § 902 (3). To be eligible for compensation, a person must be an employee as defined by § 2 (3) who sustains injury on the situs defined by § 3 (a).

### III

This Court first considered the scope of § 2 (3)'s status requirement in *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S. 249 (1977). That case concerned the claims of two workers, Blundo and Caputo. Blundo was on a pier checking cargo as it was removed from a container when he suffered a fall.[4] Caputo sustained injury while rolling a loaded dolly into a consignee's truck.[5] We recognized that neither the 1972 Act nor its legislative history states explicitly whether workers like Blundo and Caputo, who handle cargo between sea and land transportation, are employees within the meaning of § 2 (3). The Court found, however, that consideration of the legislative history in light of the remedial purposes behind the expansion of coverage reveals a clear intent to cover such workers. 432 U. S., at 267–278.

One of the reasons Congress expanded coverage in 1972 was that containerization permits loading and unloading tasks traditionally conducted aboard ship to be performed on the land. Such tasks are "longshoring operations." *Id.*, at 270–271. Blundo's job of checking and marking goods as they

---

[4] When a vessel carrying containers reaches port, the loaded containers are removed from the ship intact and moved overland. If a container holds cargo for more than one consignee, workers unload the goods for shipment inland. See *id.*, at 252–253, and n. 2.

[5] Caputo was working as a part of the traditional break-bulk cargo handling process in which each item of cargo is separately taken out of the hold of a vessel and moved ashore. *Id.*, at 255, 272.

were removed from a container was an integral part of the unloading process even though the container had been removed from a ship and trucked to a different pier before being emptied. Therefore, Blundo was an employee within the meaning of § 2 (3). 432 U. S., at 271.

Caputo, working as part of the traditional process of moving goods from ship to land transportation, was unaffected by the advent of containerization. But the Court recognized another congressional purpose relevant to the resolution of Caputo's claim. Congress wanted to ensure that a worker who could have been covered part of the time by the pre-1972 Act would be completely covered by the 1972 Act. By enlarging the covered situs and enacting the status requirement, Congress intended that a worker's eligibility for federal benefits would not depend on whether he was injured while walking down a gangway or while taking his first step onto the land. Congress therefore counted as "longshoremen" persons who spend "at least some of their time in indisputably longshoring operations." *Id.*, at 273. Caputo, who could have been assigned to loading containers and barges as well as trucks, was such a person. *Ibid.* Accordingly, the Court did not have to decide whether Caputo's work was "maritime employment" simply because he "engaged in the final steps of moving cargo from maritime to land transportation: putting it in the consignee's truck." *Id.*, at 272.

In holding that Blundo and Caputo were covered by the Act, *Northeast Marine Terminal* explicitly rejected the "point of rest" theory. Under that test, maritime employment would include only the portion of the unloading process that takes place before the stevedoring gang places cargo onto the dock. For example, a worker who carried cargo directly from a ship to a warehouse or a truck would be engaged in maritime employment, but one who carried cargo from a warehouse to a truck would not. In loading operations, only workers employed to the seaside of the last point of rest would be covered.

We explained that application of the point-of-rest test would be inconsistent with congressional intent. First, the concept, although well known in the maritime industry, was not mentioned in the Act or its legislative history. Second, the standard excludes from coverage employees like Blundo whose work was shifted landward by the use of containers. Third, the test conflicts with the express purpose of the Act because it allows workers to walk in and out of coverage as their work moves to different sides of a point of rest. *Id.*, at 275–276. In sum, "[a] theory that nowhere appears in the' Act, that was never mentioned by Congress during the legislative process, that does not comport with Congress' intent, and that restricts the coverage of a remedial Act designed to extend coverage [was] incapable of defeating our conclusion that Blundo and Caputo [were] 'employees.'" *Id.*, at 278–279.

Most of the litigation in the present case took place before our decision in *Northeast Marine Terminal.* At the initial administrative level, both Ford's and Bryant's claims for coverage were denied by Administrative Law Judges applying the point-of-rest doctrine. The Benefits Review Board reversed both decisions. The Court of Appeals for the Fifth Circuit affirmed. *Jacksonville Shipyards, Inc.* v. *Perdue,* 539 F. 2d 533 (1976). The court rejected the point-of-rest theory, holding instead that the 1972 Act covers all workers directly involved in the work of loading, unloading, repairing, building, or breaking a vessel. *Id.*, at 539–540. The court found that "Ford's work of fastening the vehicles to the flat cars was . . . the last step in transferring this cargo from sea to land transportation," *id.*, at 543, and that Bryant's work "was an integral part of the ongoing process of moving cargo between land transportation and a ship," *id.*, at 544. Accordingly, the Court of Appeals concluded that both men were covered by the 1972 Act.

We granted certiorari, vacated, and remanded for reconsideration in light of *Northeast Marine Terminal.* 433 U. S. 904

(1977).   On remand, the Fifth Circuit reaffirmed the reason-
ing of its earlier opinion.   575 F. 2d 79, 80 (1978) (*per
curiam*).   We again granted certiorari, 439 U. S. 978 (1978),
and we now affirm.

## IV

Petitioners urge that Ford and Bryant are not covered by
the 1972 Act because they were not engaged in "maritime
employment." [6]   Petitioners suggest that a person is engaged
in maritime employment only if, on the day of his injury, he
could have been assigned to perform work upon the navi-
gable waters of the United States.   By navigable waters, the
petitioners do not mean the broad situs defined in § 3 (a), as
amended by the 1972 Act; rather they refer to places seaward
of the *Jensen* line.   In other words, petitioners argue that the
1972 Act covers only workers who are working or who may be
assigned to work over the water itself.   They say that this
formulation follows congressional intent to cover all workers
who, before 1972, could have walked in and out of coverage
during any given day.[7]

---

[6] Petitioners do not dispute that both accidents took place on the situs
defined by § 3 (a), 33 U. S. C. § 903 (a), or that both men worked for
statutory employers within the meaning of § 2 (4), 33 U. S. C. § 902 (4).
Brief for Petitioners 7, n. 11, 28, n. 62.

[7] At oral argument, petitioners conceded that some workers who never
set foot on a vessel are covered by § 2 (3).   Petitioners acknowledged
that a land-based longshoreman operating a crane that lifts goods from
ship to dock is covered by the Act, although they argued that such a
worker is not engaged in maritime employment.   Tr. of Oral Arg. 10–11.
Petitioners apparently assume that a person engaged in "longshoring op-
erations" is not necessarily engaged in "maritime employment."   See *id.*,
at 14–16.   But the language of § 2 (3) provides that an employee is "any
person engaged in maritime employment, including any longshoreman or
other person engaged in longshoring operations, and any harborworker
including a ship repairman, shipbuilder, and shipbreaker. . . ."   33 U. S. C.
§ 902 (3).   The petitioners' argument supposes that the word "including"
means "and" or "as well as."   We understand the word "including" to
indicate that "longshoring operations" are a part of the larger group

Petitioners' position is plainly inconsistent with the language and structure of the 1972 Act. The Act, as noted above, contains distinct situs and status requirements. The situs test of § 3 (a) allows recovery for an injury suffered on navigable waters or certain adjoining areas landward of the *Jensen* line. This test defines the broad geographic coverage of the Act. Section 2 (3) restricts the scope of coverage by further requiring that the injured worker must have been engaged in "maritime employment." This section defines the Act's occupational requirements. The term "maritime employment" refers to the nature of a worker's activities. Thus, § 2 (3) uses the phrase "longshorem[e]n or other person[s] engaged in longshoring operations" as one example of workers who engage in maritime employment no matter where they do their job. Since § 3 (a) already limits the geographic coverage of the Act, § 2 (3) need not provide that longshoremen are covered only if they work in certain places. The use of the term "maritime employment" in § 2 (3), therefore, provides no support for the proposition that the statutory definition of an employee imports a geographic limitation narrower than the one defined in § 3 (a).[8]

The difficulty with petitioners' position becomes even plainer when their interpretation is applied to a single statutory provision that contains both the status and the situs requirement. Section 2 (4), 33 U. S. C. § 902 (4), defines an "employer" as one "any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States" as broadly defined by § 3 (a).

---

of activities that make up "maritime employment." See Webster's New Collegiate Dictionary 581 (1973).

[8] In fact, the language of the situs requirement lends independent support to the conclusion that Congress focused on occupation rather than location. The covered situs includes specific areas adjoining navigable water or any "other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel." § 3 (a), 33 U. S. C. § 903 (a). See also § 2 (4), 33 U. S. C. § 902 (4).

If the term "maritime employment" referred only to work that might take employees seaward of the *Jensen* line, then the broader situs test in the final clause of this section would become virtually superfluous. We decline the invitation to construe "maritime employment" so as to create two differing situs requirements in a single sentence. By understanding the term "maritime employment" to embody an occupational rather than a geographic concept, we give the two phases in § 2 (4) distinct and consistent meanings.

The discussion of coverage in the legislative history [9] also shows that Congress intended the term "maritime employment" to refer to status rather than situs. Committees in both Houses of Congress recognized:

> "[T]o take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity. Thus, employees whose responsibility is only

[9] The legislative history of § 2 (3) is not extensive. Committee Reports to both the House and the Senate contain identical language about the types of employees covered by the 1972 Act. See S. Rep. No. 92–1125, p. 13 (1972); H. R. Rep. No. 92–1441, pp. 10–11 (1972). The Senate Report also states that the 1972 Act "expands the coverage of this Act to cover injuries occurring in the contiguous dock area related to longshore and ship repair work." S. Rep. No. 92–1125, *supra,* at 2. Debate on the 1972 Act contributed little more than restatements of the Committee Reports and the statutory language. See, *e. g.,* 118 Cong. Rec. 36270–36271 (1972) (remarks of Sen. Williams); *id.,* at 36381–36382 (remarks of Rep. Daniels).

to pick up stored cargo for further trans-shipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo." [10]

This legislative history discusses workers solely in terms of what they are doing and never in terms of where they are working. [11]

In adopting an occupational test that focuses on loading and unloading, Congress anticipated that some persons who work only on land would receive benefits under the 1972 Act. An obvious example of such a worker is Blundo. He was checking and marking cargo from a container that had been removed from a ship and moved overland to another pier before it was opened. Without any indication that he ever would be required to set foot on a ship, this Court held that he was covered by the 1972 Act because this type of work was maritime employment. *Northeast Marine Terminal Co.*, 432 U. S., at 271.

Land-based workers who do not handle containerized cargo also may be engaged in loading, unloading, repairing, or building a vessel. The Senate Subcommittee on Labor heard testimony that 30%–35% of ship repair work is done on land. [12]

---

[10] S. Rep. No. 92–1125, *supra*, at 13; H. R. Rep. No. 92–1441, *supra*, at 11.

[11] Petitioners also cite two decisions for the proposition that pre-1972 case law defines maritime employment to include only work on the navigable waters. See *Pennsylvania R. Co.* v. *O'Rourke*, 344 U. S. 334, 339–340 (1953); *Nogueira* v. *New York, N. H. & H. R. Co.*, 281 U. S. 128, 133 (1930). Neither decision discusses what types of land-based loading or unloading operations might constitute maritime employment, probably because the situs requirement in the pre-1972 Act barred recovery for all injuries sustained on land. See *Nacirema Operating Co.* v. *Johnson*, 396 U. S. 212 (1969). In any event, the interpretation of the pre-1972 Act cannot obstruct Congress' obvious intent to include some land-based workers within the coverage of the current Act.

[12] Hearings on S. 2318 et al. before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess., 176 (1972) (testimony of Ralph Hartman, Bethlehem Steel Corp.). The

Furthermore, the usual longshoring crew includes some men whose duties may be carried out solely on the land. A typical loading gang consists of persons who move cargo from a warehouse to the side of a ship, frontmen who attach the load to the ship's gear for lifting aboard the vessel, and a hold gang which stores cargo inside the ship.[13] Although the workers who carry the cargo to shipside and the frontmen who attach the cargo to the lifting devices need not board a ship to carry out their duties, they are incontestably longshoremen directly engaged in the loading process. Even the petitioners concede that some land-based workers are covered by the 1972 Act.[14]

## V

The issue in this case thus becomes whether Ford and Bryant are the kind of land-based employees that Congress intended to encompass within the term "maritime employment." Both men engaged in the type of duties that longshoremen perform in transferring goods between ship and land transportation. If the cotton that Bryant was unloading had been brought directly from the compress-warehouse to a

---

same witness was asked if his company would favor extending federal benefits to all ship repairmen instead of continuing the pre-1972 practice of limiting federal compensation to ship repairmen who worked over the water. He stated that "we would interpose no objection . . . to extending the Longshoremen's Act to the land-based facility of the ship repair yard." *Id.*, at 177.

[13] P. Hartman, Collective Bargaining and Productivity 43–45 (1969); M. Norris, The Law of Maritime Personal Injuries § 3, p. 7 (3d ed. 1975); see U. S. Dept. of Labor, Manpower Utilization-Job Security in the Longshore Industry (Boston) 40–41 (1964); *id.* (Baltimore), at 32; *id.* (Houston-Galveston), at 45–46, 65–69; *id.* (Jacksonville-Charleston), at 38–40, 57–59; *id.* (Mobile), at 36–37; *id.* (New Orleans), at 35–36; *id.* (New York), at 21–24; *id.* (Philadelphia), at 37–38. A Committee of the House of Representatives found in 1922 that longshoremen may be "unloading a dray or a railroad car or moving articles from one point on the dock to another" as well as actually moving cargo on or off ship. H. R. Rep. No. 639, 67th Cong., 2d Sess., 2 (1922).

[14] See n. 7, *supra.*

ship, his task of moving cotton off a dray wagon would have been performed by a longshoreman.[15]  Similarly, longshoremen—not warehousemen like Ford—would fasten military vehicles onto railroad flatcars if those vehicles went directly from a ship to the railroad cars.[16]  The only basis for distinguishing Bryant or Ford from longshoremen who otherwise would perform the same work is the point-of-rest theory. That is, longshoremen in the Ports of Beaumont and Galveston would have performed the work done by Bryant and Ford had the cargo moved without interruption between land and sea transportation. Our unanimous opinion in *Northeast Marine Terminal* expressly decided that application of the point-of-rest test to define the scope of maritime employment would be contrary to congressional intent. *Id.*, at 275–279. Thus, there is no principled basis for distinguishing Ford and Bryant from longshoremen who have been injured while performing the same tasks.

We believe that § 2 (3)'s explicit use of the terms "longshoreman" and "other person engaged in longshoring operations" to describe persons engaged in maritime employment demonstrates that workers doing tasks traditionally performed by longshoremen are within the purview of the 1972 Act. We do not suggest that the scope of maritime employment depends upon the vagaries of union jurisdiction. 432 U. S., at 268, n. 30.  Instead, the crucial factor is the nature of the activity to which a worker may be assigned. Persons moving cargo directly from ship to land transportation are engaged in maritime employment. *Id.*, at 267, n. 28.[17]  A worker responsible

---

[15] *Supra*, at 72.

[16] *Supra*, at 71.

[17] As noted above, see *supra*, at 71–72, longshoremen in the Ports of Beaumont and Galveston handle all cargo that moves directly between ship and land transportation. That arrangement appears to reflect a general industry rule. See Hartman, *supra* n. 13, at 60; U. S. Dept. of Labor, Manpower Utilization-Job Security in the Longshore Industry (Baltimore) 31 (1964); *id.* (New Orleans), at 35; *id.* (Jacksonville), at 40.

for some portion of that activity is as much an integral part of the process of loading or unloading a ship as a person who participates in the entire process. We therefore hold that Ford and Bryant were engaged in maritime employment because they were engaged in intermediate steps of moving cargo between ship and land transportation.[18]

Our decision serves the intent of Congress in creating the status requirement. First, it focuses upon the nature, not the location, of employment. Second, it does not extend coverage to all workers in the situs area. There is no doubt for example, that neither the driver of the truck carrying cotton to Galveston nor the locomotive engineer transporting military vehicles from Beaumont was engaged in maritime employment even though he was working on the marine situs. Such a person's "responsibility is only to pick up stored cargo for further trans-shipment." S. Rep. No. 92–1125, p. 13 (1972); H. R. Rep. No. 92–1441, p. 11 (1972); see *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S., at 267, 275, n. 37.

Our decision today also serves the broader congressional purpose of expanding coverage. Congress intended to apply a simple, uniform standard of coverage. Adoption of the petitioners' test would conflict with that goal, because any individual worker's coverage would depend upon the assignment policies of his employer. For example, a land-based worker would be covered if his employer allowed him to alternate assignments with co-workers who work on the water, but he would not be covered if the employer never allowed him to board a ship. Congress did not intend the Act's coverage to shift with the employer's whim. See *id.*, at 276, n. 38. In contrast, a defini-

---

[18] Congress was especially concerned that some workers might walk in and walk out of coverage. Our observation that Ford and Bryant were engaged in maritime employment at the time of their injuries does not undermine the holding of *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S., at 273–274, that a worker is covered if he spends some of his time in indisputably longshoring operations and if, without the 1972 Act, he would be only partially covered.

tion of maritime employment that reaches any worker who moves cargo between ship and land transportation will enable both workers and employers to predict with reasonable assurance who on the situs is protected by the 1972 Act.

Because the Court of Appeals correctly determined that Ford and Bryant were engaged in maritime employment at the time of their injuries, its judgment is

*Affirmed.*