623 F.2d 332
 Clarence and Grace TAYLOR, Parents of Clarence A. Taylor
(Deceased), Petitioners,
v.
ZAPATA HAYNIE CORPORATION, and Hartford Accident and
Indemnity Company, Respondents,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, Respondent.
 No. 79-1576.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 9, 1980.
Decided June 12, 1980.
 
 John H. Klein, Norfolk, Va. (Breit, Rutter & Montagna, Norfolk, Va., on brief), for petitioners.
 Palmer S. Rutherford, Jr., Norfolk, Va. (Eley, Rutherford & Leafe, Norfolk, Va., on brief), for respondents.
 Before HAYNSWORTH, Chief Judge, and HALL and SPROUSE, Circuit Judges.
 HAYNSWORTH, Chief Judge:
 
 
 1
 The Benefits Review Board of the Department of Labor denied benefits under the Longshoremen's and Harbor Workers' Act to the parents of a man killed while unloading menhaden from a truck. They have appealed, contending that the unloading of the truck was part of the process of unloading a boat at a dock some forty-five miles away, but we find the contention unpersuasive.
 
 I.
 
 2
 Zapata Haynie Corporation owns and operates a processing plant at waters edge in Reidville, Virginia where it converts trash fish such as menhaden into fish oil and other commercial products. Approximately 98% of its supply of menhaden is unloaded from boats tied up to its dock, but it purchases a small portion of its supply of menhaden from dealers who deliver the fish by truck. The decedent was killed while unloading such a truck.
 
 
 3
 The menhaden on the truck had been acquired by a dealer and processor of seafood and other fish in Matthews, Virginia.
 
 
 4
 The dealer testified that he processes, packages and sells edible fish, having processed 3,000 cartons of such fish during the week preceding his testimony. He uses thirty to fifty bushels of menhaden a day as bait for catching crabs, but when he has some 6,000 to 10,000 pounds of menhaden in excess of his own need, he will sell them to a processing plant, such as Zapata Haynie, and deliver them by truck.
 
 
 5
 On the day in question, catches from the boats unloaded at the dock in Matthews contained a large quantity of menhaden. The dealer kept some of them for his own use that day as bait, froze more of them against his own future need, and sold the remainder to Zapata Haynie.
 
 
 6
 The decedent was employed by Zapata Haynie at its processing plant as a member of its "yard crew." Most of the maintenance work he did and odd jobs he performed were clearly not maritime in nature. On only one or two occasions during the several years of his employment had he assisted in the unloading of a boat, but his duties did include assistance in the unloading of fish received by overland delivery on trucks. On the day of his death, he was using a high pressure hose to wash menhaden from the truck into an augur which moved the fish into the "raw box," the start of the plant's process. By different means, menhaden unloaded from boats at the dock are moved into the same raw box, for all of the raw material received at the plant was drawn from it for processing.
 
 II.
 
 7
 It is not contended that the decedent was participating in any way in the unloading of any boat at Zapata Haynie's dock in Reidville. It is contended that the unloading of the truck was part of the process of unloading a boat or boats at the dock in Matthews, some forty-five miles away.
 
 
 8
 The Longshoremen's and Harbor Workers' Compensation Act, as amended in 1972, provides benefits for the disability or death of one engaged in maritime employment, with certain exceptions, from an injury occurring upon navigable waters, defined to include adjoining piers, wharfs and terminals customarily used by the employer in the loading or unloading of vessels. 33 U.S.C.A. § 903(a). This requires that the employee at the time of injury satisfy both a situs and a status test.[1] The decedent arguably met the broad definition of situs,[2] so that he would have been covered if he met the status test. The latter test, however, was not met.
 
 
 9
 The plaintiff's theory is derived by analogy from the containerized freight cases, Northeast Marine Terminal Co., Inc. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 306 (1977), but the analogy is much too imperfect to be persuasive.
 
 
 10
 The stuffing and stripping of containers used for the transportation of freight in maritime commerce is readily perceived as part of the process of loading and unloading the vessel. Particularly when the goods in a container are destined for different consignees, delivery to the consignee cannot be effected until the container has been stripped. At least, until the cargo has been sorted and checked and placed for delivery to the consignee, the people handling it are engaged in the unloading process.
 
 
 11
 In Caputo and in P. C. Pfeiffer Co., Inc. v. Ford, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979), the Supreme Court adopted an even more expansive test. One meeting the situs requirement is covered when engaged in the movement of cargo from maritime to land transportation. "(P)utting it in the consignee's truck,"[3] was said in Caputo to have been the final step in that process. In Pfeiffer, the Act was held to cover a longshoreman unloading cotton bales from a dray for storage before being loaded on to a ship and one engaged in securing military vehicles to a flat car for inland transportation after the vehicles had been transported by a vessel. These workers "were engaged in the intermediate steps of moving cargo between ship and land transportation."[4] The process of loading the ship does not begin before the end of the land transportation, nor does it continue beyond a loading of a vehicle for inland transportation by and at the direction of the consignee.
 
 
 12
 Here the dealer was the owner of the cargo which had been unloaded from the vessel or vessels at Matthews. He had taken exclusive possession of it after it had been unloaded upon his truck or trucks. He was free to retain the menhaden for use in his own business, and he did retain some of them. He was entirely free to dispose of the remainder of the menhaden in any manner he chose, and to deliver them to any place, inland or on water. Caputo and Pfeiffer make it clear that the unloading of the boat was completed when the consignee's land transportation vehicle was loaded and overland transportation away from the dock began.
 
 
 13
 There was no containerization of these fish, and the unloading of the truck several hours after the consignee had taken exclusive possession of them and many miles away from the dock at which they had been unloaded, was properly seen by the Benefits Review Board as no part of the process of unloading the boat.
 
 
 14
 AFFIRMED.
 
 
 
 [1]
 Northeast Marine Terminal Co., Inc. v. Caputo, 432 U.S. 249, 256-65, 97 S.Ct. 2348, 2353-2358, 53 L.Ed.2d 306 (1977)
 
 
 [2]
 See Newport News Shipbuilding & Dry Dock Co. v. Graham, 563 F.2d 167, 169 (4th Cir. 1978)
 
 
 [3]
 Caputo, supra, 432 U.S. at 272, 97 S.Ct. at 2361
 
 
 [4]
 444 U.S. at 83, 100 S.Ct. at 337. This is not a case of intermediate use during the unloading process. Final delivery to the consignee had taken place in Matthews, Virginia