[Nos. 10160–9–I; 11563–4–I.   Division One.   February 6, 1984.]

RICHARD N. LINDQUIST, *Respondent,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant.*

*Kenneth O. Eikenberry, Attorney General,* and *Dinah C. Pomeroy, Assistant,* for appellant.

*Ken St. Clair, Detels, Madden, Crockett & McGee,* and *J. Richard Crockett,* for respondent.

[As amended by order of the Court of Appeals May 1, 1984.]

Andersen, J.—

## FACTS OF CASE

At issue in the case is which of two workers' compensation acts covers the fatal injury sustained by Richard N. Lindquist, a longshoreman, at the North Terminal of the Port of Bellingham—the federal Longshoremen's and Harbor Workers' Compensation Act, (Longshoremen's Act), or the Industrial Insurance Act of the State of Washington (State Act).

The following facts were stipulated:[1]

Mr. Lindquist was fatally injured when he fell from the back of a pickup truck on the North Terminal of the Port of Bellingham.

The accident occurred at approximately 4:15 p.m. on March 26, 1976. As a result of the injuries sustained Mr. Lindquist died at 0900 hours on March 30, 1976.

The driver and owner of that vehicle was Harvey C. Muggy. Other persons involved, as explained below, included Barry L. Frost and Edward L. Jones.

The Claimant and the other men identified above had been employed by Jones Washington Stevedoring Company on March 24, 1976 to work aboard the logship Grand Felicity.

Mr. Lindquist was not injured on board the vessel, but had he been injured on the vessel, the parties agree that accident would have been covered by maritime laws.

---

[1]The written stipulation of facts was filed at the hearing before the Board of Industrial Insurance Appeals examiner. Accordingly, we look to such stipulated facts rather than to the Board's findings on the factual issues covered thereby. *See generally Puget Sound Bridge & Dredging Co. v. Department of Labor & Indus.,* 26 Wn.2d 550, 555, 174 P.2d 957 (1946).

The GRAND FELICITY was located at Berth No. 2, to the west of Warehouse No. 1, North Terminal, Port of Bellingham.

The loading of the GRAND FELICITY had been completed by approximately 4:00 p.m. on the date of the accident. The men were released from work at that time, though by union agreement they are guaranteed their pay to the end of the particular shift (5:00 p.m.) on which they are working should their work end earlier.

Mr. Lindquist and his fellow workers began leaving the vessel and the dock area at 4:00 p.m. on the date of the accident to return to their vehicles. Mr. Lindquist and his fellow workers stopped at the lunch and gear storage room in Warehouse No. 2 to change their clothes and exchange their gear, before continuing on toward the parking area and their vehicles. The lunch/gear room was approximately 900 feet from the GRAND FELICITY.

As Mr. Lindquist, Frost and Jones emerged from the lunchroom, Mr. Muggy appeared in his pickup. Mr. Lindquist and Mr. Frost hopped on the tail end of the truck (the tailgate had been removed) and Mr. Jones got into the cab. Mr. Lindquist was carrying his rain gear and lunch box in both arms while in the vehicle.

The route taken by the Muggy vehicle was the usual route for getting from the gear/lunchroom of Warehouse No. 2 to the parking area.

Mr. Muggy just began to drive away when Mr. Lindquist fell from the truck, landed on his buttocks and then fell backwards, striking the back of his head on the pavement. The truck had traveled 38 feet when Mr. Lindquist fell, a total of 65 feet from the door of the lunchroom.

Mr. Lindquist fell at a point just before the crosswalk and rolled into the crosswalk. His car was located a distance of 92 feet from his final resting point, in a small parking area near the terminal. There was another parking area for longshoremen, near the main gate.

The accident resulted in a skull fracture and cerebral concussion. The attending physician was Dr. Charles Anderson and treatment was first given at St. Lukes General Hospital in Bellingham. Mr. Lindquist was transferred to Providence Hospital in Everett. His death came as a direct consequence of the skull fracture.

For the quarter beginning January 1, 1976 and ending

March 31, 1976, Jones Washington Stevedoring Company paid premiums for workmen's compensation coverage to the Department of Labor and Industries for workmen in King, Pierce, Grays Harbor, Clallam, Snohomish and Whatcom counties for the following hours in the following classes:

| Class 42–1 | Stevedoring, | Dock | 6,313 | hours |
|---|---|---|---|---|
| " | " | Clerks | 3,464 | " |
| " | " | Gear Locker | 11,157 | " |
| " | " | Superintendents | 5,024 | " |
| " | " | Executive | 1,040 | " |
| Class 49–4 | Clerical Office | | 6,022 | " |
| Class 63–3 | Salesmen | | 2,600 | " |

Exhibit A is a true and accurate plan of the North Terminal area, Port of Bellingham, as of the date of accident. The plan accurately depicts the location of the vessel, and the red dash marks show claimant's route of travel from the ship to the gear storage/lunchroom area. The depiction of the parking areas, crosswalk and vehicle (M representing Mr. Muggy's pick up truck) are true and accurate as are the dimensions noted. The circled X represents the final resting place of Mr. Lindquist's body.

(Paragraph numbers deleted.)

Although there is some measure of ambiguity in the language of this stipulation wherein it first refers to the fall as having been from the pickup truck located "*on* the North Terminal of the Port of Bellingham" (italics ours) and then refers to the fall as having occurred 92 feet from where the decedent's car was located in a parking area "*near* the terminal" (italics ours), the diagram entitled "Exhibit A" which is incorporated into the stipulation clarifies this. As the diagram clearly establishes, the parking lot where the decedent's car was parked and to which he was proceeding at the time of his fatal accident was a part of the same terminal where all of the other events referred to in the stipulation took place.

Claims for death benefits were filed under both the Longshoremen's Act and the State Act. The Longshoremen's Act claim has been held in abeyance while the claimant pressed the State Act claim. The State Act claim was rejected by the Department of Labor and Industries of the

State of Washington and the Board of Industrial Insurance Appeals affirmed the Department's order. The case was appealed from the Board to the Superior Court of the State of Washington for Whatcom County where, after a trial to the court, the Board's order was reversed. The Department has now appealed to this court. Subsequent orders entered by the Superior Court in this cause have also been appealed by the Department and the appeals have been consolidated herein.

Two issues are determinative of these consolidated appeals.

## ISSUES

ISSUE ONE. At the time of the fatal injury, was the decedent a worker for whom a right existed under the maritime laws for personal injuries or death and thereby excluded from coverage under the State Act?

ISSUE TWO. Since the decedent's employer had segregated its payroll and reported a small part of the decedent's time to the Department under the State Act, was coverage on that account afforded under the State Act?

## DECISION

ISSUE ONE.

CONCLUSION. At the time the worker in this case sustained his fatal injuries, he was a worker for whom a right existed under the maritime laws for personal injury or death. Accordingly, the death claim arising from that injury is expressly excluded from coverage under the Industrial Insurance Act of Washington, RCW Title 51, and properly lies under the federal Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901 *et seq.*

The issue here is not whether there is workers' compensation coverage for the death of the decedent but whether the State Act covered it, as the claimant contends, or whether the federal Longshoremen's Act covered it, as the Department contends. The case comes to us in the somewhat unusual posture of a claimant seeking coverage under the State Act rather than under the Longshoremen's Act. 4 A. Larson, *Workmen's Compensation* § 89.71, at 16–286.41 (1983) points out that except in Alaska benefits are ordi-

narily higher under the Longshoremen's Act, therefore, "in every state but Alaska, the pressure will usually be to get out of state acts and into the federal act." (Footnote omitted.) *See also Director, Office of Workers' Comp. Programs v. Perini N. River Assocs.,* 459 U.S. 297, 342 n.26, 74 L. Ed. 2d 465, 103 S. Ct. 634 (1983); *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 262–63, 53 L. Ed. 2d 320, 97 S. Ct. 2348 (1977) (and the legislative history cited in these cases).

The part of the State Act which deals with maritime occupations is RCW 51.12.100. This statute is set forth in full in the margin[2] and the pertinent parts thereof will be separately discussed in the course of our opinion.

The Department has contended from the inception of this case that coverage for the decedent's death is precluded under the State Act by the first paragraph of that statute (see footnote 2). It reads:

> *The provisions of this title shall not apply to* a master or member of a crew of any vessel, or to employers and *workers for whom a right or obligation exists under the maritime laws for personal injuries or death of such workers.*

---

[2]RCW 51.12.100 reads as follows:

"Maritime occupations—Segregation of payrolls—Common enterprise. The provisions of this title shall not apply to a master or member of a crew of any vessel, or to employers and workers for whom a right or obligation exists under the maritime laws for personal injuries or death of such workers.

"If an accurate segregation of payrolls of workers for whom such a right or obligation exists under the maritime laws cannot be made by the employer, the director is hereby authorized and directed to fix from time to time a basis for the approximate segregation of the payrolls of employees to cover the part of their work for which no right or obligation exists under the maritime laws for injuries or death occurring in such work, and the employer, if not a self–insurer, shall pay premiums on that basis for the time such workers are engaged in their work.

"Where two or more employers are simultaneously engaged in a common enterprise at one and the same site or placed in maritime occupations under circumstances in which no right or obligation exists under the maritime laws for personal injuries or death of such workers, such site or place shall be deemed for the purposes of this title to be the common plant of such employers.

"In the event payments are made under this title prior to the final determination under the maritime laws, such benefits shall be repaid if recovery is subsequently made under the maritime laws."

(Italics ours.) RCW 51.12.100 (part). Thus, since the State Act by its terms excludes coverage for "workers for whom a right or obligation exists under the maritime laws for personal injuries or death of such workers", we, of necessity, turn to the maritime laws in order to determine whether the claimant has a right thereunder.

The parties agree that if such a right exists, it must exist under the Longshoremen's Act, 33 U.S.C.A. §§ 901 *et seq.,* or not at all. In general, that act provides for the payment of compensation benefits for disability or death of an employee coming under it if the employee's disability or death results from an injury occurring upon "navigable waters" of the United States, as that term is defined in the act.

The law dealing with the resolution of conflicts between the Longshoremen's Act and the various state workers' compensation acts has evolved through numerous and oftentimes major changes. Since the federal maritime power is preeminent under article 3, section 2 of the United States Constitution, these changes have for the most part come about through decisions of the United States Supreme Court. As one authoritative text that contains a detailed chronicle of all of these changes notes in that regard, "[s]even phases can be detected in the unfolding of this story, each representing a dramatic change in state–maritime relations." 4 A. Larson, *Workmen's Compensation* § 89.20, at 16–158 (1983). *See also Sun Ship, Inc. v. Pennsylvania,* 447 U.S. 715, 65 L. Ed. 2d 458, 100 S. Ct. 2432, *reh'g denied,* 448 U.S. 916, 65 L. Ed. 2d 1179, 101 S. Ct. 37 (1980) (tracing the evolution of the law of maritime workers' compensation). Present law on the subject, however, is now largely predicated on statutory changes wrought by Congress in 1972, and it is those changes which we must primarily consider in deciding the issues before us.[3]

Congress, by its 1972 amendments to the Longshoremen's Act, created a 2–tiered test of coverage under that

---

[3]For a discussion of the legal remedies available to injured maritime employees before the 1972 amendments to the Longshoremen's Act, see our opinion in *Garrisey v. Westshore Marina Assocs.,* 2 Wn. App. 718, 469 P.2d 590 (1970).

act. These tiers are now customarily referred to as the "situs" and "status" requirements.

First: The Situs Test—Before 1972, coverage under the Longshoremen's Act had turned exclusively on the situs of the injury and that situs was strictly bounded by navigable waters. The 1972 amendments, however, expanded that concept landward by embracing areas of the sort that might ordinarily be the setting for injuries in maritime employment. *See generally Caputo,* 432 U.S. at 279–81; *Stockman v. John T. Clark & Son,* 539 F.2d 264, 271–72, 45 A.L.R. Fed. 227 (1st Cir. 1976), *cert. denied,* 433 U.S. 908, 53 L. Ed. 2d 1092, 97 S. Ct. 2972 (1977); 4 A. Larson, *Workmen's Compensation* § 89.35 (1983); 1 M. Norris, *Maritime Personal Injuries* § 66 (3d ed. Cum. Supp. 1983).

The section of the Longshoremen's Act setting out the situs test, with the 1972 amendatory language italicized, now reads as follows:

> Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States *(including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).*

(Italics ours.) Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 903(a) (as amended by Pub. L. No. 92–576, § 2(c), 86 Stat. 1251 (1972)).

Obviously the situs test is satisfied in the case before us since the fatal injury occurred on the terminal adjoining navigable waters where the vessel, which had just been loaded by the decedent and other longshoremen, was berthed. The claimant so concedes. Brief of Respondent, at 9.

Next: The Status Test—This test was added for the first time by the 1972 amendments. Prior to that, nothing in the act limited the concept of a covered "employee" in terms of the character of the worker's activities. The section of the Longshoremen's Act setting out the status test, with the 1972 amendatory language italicized, now reads as follows:

The term "employee" *means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term* does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.

(Italics ours.) Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 902(3) (as amended by Pub. L. No. 92–576, § 2(a), 86 Stat. 1251 (1972)).

The reason for the addition of the status test to the Longshoremen's Act is that since the situs test had so enlarged the geographical area covered by the act, it became necessary to carefully delineate the class of workers Congress desired to compensate; and Congress did not intend to cover employees under the act who were not engaged in loading, unloading, repairing, or building vessels, just because they happened to be injured in an area adjoining navigable waters used for such activities. *Perini,* 459 U.S. at 317–18. *See also* 4 A. Larson, *Workmen's Compensation* § 89.41, at 16–222 (1983).

The claimant argues that the decedent did not meet the status test. We disagree.

■ "A claimant's status as a covered 'employee' is determined by an evaluation of his work activities considered as a whole, not of his activity at the moment of injury." 4 A. Larson, *Workmen's Compensation* § 89.43, at 16–259 (1983). *See also Schwabenland v. Sanger Boats,* 683 F.2d 309 (9th Cir. 1982), *cert. denied,* 459 U.S. 1170, 74 L. Ed. 2d 1013, 103 S. Ct. 814 (1983) (holding that regular performance of maritime operations, even though less than a substantial portion of overall working time, satisfies the status requirement); *Brady–Hamilton Stevedore Co. v. Herron,* 568 F.2d 137, 140 (9th Cir. 1978) (rejecting the "moment of injury" requirement for satisfying the status test).

As the United States Supreme Court held in *Caputo,* 432 U.S. at 273:

The [Longshoremen's] Act focuses primarily on occupa-

tions—longshoreman, harbor worker, ship repairman, shipbuilder, shipbreaker. Both the text and the history demonstrate a desire to provide continuous coverage throughout their employment to these amphibious workers who, without the 1972 Amendments, would be covered only for part of their activity.

Then as the Supreme Court later reaffirmed in *P.C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 83 n.18, 62 L. Ed. 2d 225, 100 S. Ct. 328 (1979):

> Congress was especially concerned that some workers might walk in and walk out of coverage. Our observation that Ford and Bryant were engaged in maritime employment at the time of their injuries does not undermine the holding of *Northeast Marine Terminal Co.* v. *Caputo,* 432 U. S. at 273–274, that a worker is covered if he spends some of his time in indisputably longshoring operations and if, without the 1972 Act, he would be only partially covered.

Under the stipulated facts, the decedent in this case meets the status test when his work activities are evaluated as a whole rather than just considering his activity at the moment of his injury. At the moment of the fatal injury he was, of course, on his way to his car preparatory to leaving the terminal for his home. He had, however, been working all that day as a longshoreman, a job which is a classic maritime activity, and at the time of his injury, decedent was still on the terminal premises adjacent to the vessel he had just helped load and was being paid his full longshoring wages.[4]

---

[4]It is implicit in this decision that, under the stipulated facts, the deceased worker's fatal injuries arose "out of and in the course of employment", 33 U.S.C.A. § 902(2). *See* 4 A. Larson, *Workmen's Compensation* § 89.43, at 16–283 to 284 (1984); 1 A. Larson, *Workmen's Compensation* § 21.60 at 5–31, § 21.61 (1982). Under these facts the "work connection" test was amply met. *See* 1 A. Larson, *Workmen's Compensation* § 6.10, at 3–3 (1982). It is not "necessary that the employee be engaged at the time of the injury in activity of benefit to his employer." *O'Leary v. Brown–Pacific–Maxon,* 340 U.S. 504, 507, 95 L. Ed. 483, 71 S. Ct. 470 (1950). It is only necessary that he had not become "so thoroughly disconnected from the service of his employer that it would be entirely unreasonable to say that injuries suffered by him arose out of and in the course of his employment." *O'Leary,* at 507.

ISSUE TWO.

CONCLUSION. The stipulated facts clearly establish that the deceased worker had a right under the maritime laws for personal injuries and death, therefore, how the employer segregated the decedent's time and reported its payroll for insurance purposes is not determinative of which act applies and, in this case, in view of the facts as stipulated, is immaterial.

The only live testimony presented at the hearing before the Board of Industrial Insurance Appeals examiner concerned the employer's practice of segregating its payroll for dock stevedores (longshoremen such as the decedent). This testimony was to the effect that the employer's payroll segregation was for insurance purposes and that most of the payroll was reported to its Longshoremen's Act insurance carrier[5] and the remaining small part thereof was reported to the State Department of Labor and Industries under the State Act. Such testimony came in over objection by the Department on various grounds including that it was not relevant or material to the issues in the case. The Board's findings of fact tracked the stipulated facts, but as to the matter of the payroll segregation, it apparently deemed that immaterial and made no finding of fact or express decision concerning it.

On appeal to the Superior Court, that court entered findings of fact and conclusions of law which also closely tracked the stipulated facts, but then added the following two additional findings of fact:

9. Jones Washington Stevedoring Company [decedent's employer] had for several years prior to March 26, 1976 segregated its payroll for maritime and nonmaritime work. On the day of the accident, Jones Washington paid payroll premiums to the Department of Labor and Industries for a portion of Mr. Lindquist's time after he left the Grand Felicity at 4:00 p.m. Jones Washington

---

[5]While the testimony of the employer's witnesses indicates that the employer had a Longshoremen's Act insurance carrier, the record is less than conclusive as to whether the employer in fact had such an insurance policy or was self-insured.

Stevedoring Company had not paid payroll premiums to the Department on the day of the accident for the time up until 4:00 p.m.

10. It was not the intent of the Washington legislature to create a hiatus in coverage between the Washington Industrial Insurance Act and the federal Longshoreman and Harborworkers Compensation Act. One of the purposes of the Washington Industrial Insurance Act is to provide compensation to workers who are injured in the course and scope of their employment, without regard to fault.

Pertinent to the payroll segregation matter is the second paragraph of RCW 51.12.100 (see footnote 2) which provides:

> If an accurate segregation of payrolls of workers for whom such a right or obligation exists under the maritime laws cannot be made by the employer, the director is hereby authorized and directed to fix from time to time a basis for the *approximate segregation* of the payrolls of employees *to cover the part of their work for which no right or obligation exists under the maritime laws* for injuries or death occurring in such work, and the employer, if not a self–insurer, shall pay premiums on that basis for the time such workers are engaged in their work.

(Italics ours.) RCW 51.12.100 (part).

In claiming that the Superior Court's finding of fact 9 was erroneous, the Department contends it is misleading. The Department argues that the undisputed testimony was that the employer reported the decedent's time for Longshoremen's Act insurance purposes as "offshore" until 4:30 p.m. and then to the Department under the State Act as "no work provided" from 4:30 p.m. to 5 p.m. (the injury was at 4:15 p.m.). The record bears out the Department's claim concerning these facts but a close reading of the Superior Court's finding of fact 9 shows that it actually does not directly conflict with the Department's contentions.

In the case before us, however, we deem the entire matter of segregation of payrolls, and what part of the

decedent's pay was reported to whom for insurance purposes as immaterial to the determinative issue of whether or not, at the time of the accident, the worker had a right under the maritime laws for personal injuries or death.

As the Superior Court held in its conclusion of law labeled finding of fact 10 (quoted above), it was, indeed, not the intent of the Legislature to create a hiatus in coverage between the State Act and the Longshoremen's Act. The second paragraph of RCW 51.12.100, set out just above, is aimed at preventing just that. It provides an orderly procedure for the "approximate segregation" of employee payrolls so as "to cover the part of their work for which no right or obligation exists under the maritime laws for injuries or death", such injuries or death having been expressly excluded from the State Act by the immediately preceding paragraph of that same statute (see footnote 2). It is entirely possible for factual patterns to occur whereby injuries could occur to longshoremen within the scope of their employment, but for which they might not have a right to compensation under the Longshoremen's Act, and it is to cover such contingencies that the segregation statute was enacted and a part of the longshoremen's payroll was reported under the State Act.

Historically, prior to the shoreward extension of the Longshoremen's Act by the 1972 amendments, a frequently expressed concern was that of a stevedore walking in and out of the Longshoremen's Act dozens of times daily depending on the number of trips the stevedore happened to make across the gangplank. *See P.C. Pfeiffer Co. v. Ford, supra.*

To rule as the claimant asks us to do here, that when a payroll "segregation has been made, [State Act] coverage is and should be in effect for that part of the man's working time reported to the Department for onshore and non maritime work" (Brief of Respondent, at 21), would abdicate the determination of the scope of maritime employment to

the vagaries of payroll segregation and reporting by the employer's clerks. To use the phraseology of the court in *Herron,* 568 F.2d at 140, this "would be to reinstate the same degree of 'shifting and fortuitous coverage that Congress intended to eliminate.'" Nothing in the statute pertaining to state segregation of payrolls, RCW 51.12.100 (see footnote 2), suggests a course such as the claimant advocates; indeed, it compels the opposite conclusion.

We hold that the Superior Court erred when it: concluded that the decedent was covered by the State Act; reversed the decision of the Board and entered the judgment that it did. Having decided this case on the basis we have, it is not necessary to address the other issues raised.[6]

The judgment of the Superior Court is reversed and the cause is remanded for further proceedings not inconsistent

---

[6]One other matter, however, should be touched on parenthetically.

In its brief filed with the Board, the claimant argued the "twilight zone" and "concurrent jurisdiction" doctrines. *See Davis v. Department of Labor & Indus.,* 317 U.S. 249, 87 L. Ed. 246, 63 S. Ct. 225 (1942), *reh'g denied,* 317 U.S. 713, 87 L. Ed. 567, 63 S. Ct. 438 (1943); *Calbeck v. Travelers Ins. Co.,* 370 U.S. 114, 8 L. Ed. 2d 368, 82 S. Ct. 1196 (1962). Claimant does not, however, argue the applicability of those doctrines on appeal to this court, therefore, we make no determination as to their applicability in cases such as this one.

Since those doctrines were raised before the Board, however, and since claimant's briefs on the subject were a part of the record presented to the Superior Court for its review, it is possible that the trial court was persuaded by those doctrines. The record before us is such that we are unable to determine if that happened here or not, but under the circumstances it is appropriate that we at least refer to those doctrines.

The "twilight zone" and "concurrent jurisdiction" doctrines have maintained their efficacy after the 1972 amendments to the Longshoremen's Act, and states "may" also apply their compensation laws to land–based injuries of the sort in issue in this case, thus overlapping the Longshoremen's Act and giving the injured worker an election as to which act he or she desires to claim under. Subsequent to the 1972 amendments to the Longshoremen's Act, however, the Legislature of this state changed the language of RCW 51.12.100 to specifically require, as it now does, that the State Act "shall not" apply to workers who have a right to recover for personal injuries or death under the maritime laws. Laws of 1975, 1st Ex. Sess., ch. 224, § 3 (see footnote 2). It would, therefore, appear to be at least questionable as to whether the "twilight zone" and "concurrent jurisdiction" doctrines maintain their viability in this state in cases such as the one at bench.

660

herewith.

DURHAM, C.J., and WILLIAMS, J., concur.

Reconsideration denied May 3, 1984.

Review denied by Supreme Court July 13, 1984.