865 F.2d 1257
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Lawrence M. DAVIS, Petitioner/Appellant,
v.
DORAN COMPANY OF CALIFORNIA, Respondent/Appellee.
 No. 88-3505.
 United States Court of Appeals, Fourth Circuit.
 Argued: Nov. 1, 1988.
Decided: Jan. 4, 1989.
 
 Robert Elliott Walsh (John H. Klein, Rutter & Montagna, on brief), for appellant.
 George Maralan Kelley, III (Guy, Cromwell, Betz 7 Lustig, P.C., on brief), for appellees.
 Before WIDENER, CHAPMAN and WILKINS, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 Appellant, Lawrence M. Davis, seeks reversal of a decision by the Benefits Review Board (BRB) denying him workers' compensation benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C.A. Secs. 901 et seq. (1972) (LHWCA).[1] The BRB affirmed a determination by an Administrative Law Judge (ALJ) that the injury did not occur on navigable waters or an adjoining maritime area as required by 33 U.S.C.A. Sec. 903(a). Under such a ruling, neither the ALJ nor the BRB had subject matter jurisdiction over this action. We affirm.
 
 
 2
 Lawrence M. Davis was employed by Doran Company of California (Doran) as a shophelper in April of 1977. Davis' duties consisted of positioning marine propellers on the floor of Doran's shop as well as assisting in their grinding and polishing. While positioning one of the propellers on September 28, 1977, Davis suffered a work-related back injury when a crane cable snapped, striking him in the back of his head, and causing him to fall. After his injury, Davis never returned to work for Doran and received workers' compensation under Virginia state law until such time in 1978 when the Norfolk Naval Shipyard hired him as a pipefitter's apprentice.
 
 
 3
 At all times relevant to this proceeding, Doran was engaged in the repair of marine propellers for the United States Navy. All the propellers which Doran serviced were delivered to and picked up from Doran's shop by the Navy. All the propellers on which Doran worked came from parts inventory and were returned thereto; none of the propellers were either directly removed from or directly returned to a ship under repair.
 
 
 4
 Doran's shop was located at 26th Street in Norfolk, Virginia in approximately 25% of a high steel skeleton structure which it leased from E.T. Gresham Company (Gresham). Doran's portion was partitioned off from Gresham's by an eight-foot wall, but Doran occasionally used entrances located in Gresham's part for delivery and return of the propellers. Gresham used its portion for its business activities which consisted of crane service and industrial maintenance. Although Gresham primarily rented the cranes for land-based use, it occasionally rented mobile cranes to businesses for the loading and unloading of barges at the Norfolk waterfront.
 
 
 5
 During Davis' employment, Doran's shop was at least one mile from navigable waters by air and two miles by street route. Neither the Gresham property nor Doran's portion thereof adjoined or bordered on any shipyard, railway, marine terminal or other facility used for loading and unloading ships, vessels or marine cargo or used for the building, repair or breaking of ships or vessels. The Gresham property was zoned M-1 which permitted indoor manufacturing operations.
 
 
 6
 At the hearing before the ALJ, both sides presented evidence on the character of the area in which Doran's shop was located. Davis called a real estate consultant, James Carr, as an expert. Carr conducted a survey of the area and certain selected businesses located therein. From this survey, Carr found that approximately 33% of the businesses were substantially or significantly involved in the maritime industry. Since the percentage for Norfolk as a whole was 21%, Carr concluded that the subject area where Doran was located was maritime in nature.
 
 
 7
 Conversely, Doran presented an expert opinion from Evan Pierce, a real estate appraiser and consultant, who testified that the area was no more and no less maritime in character than any other light industrial area in Norfolk. Furthermore, Doran produced evidence demonstrating that all of the major shipbuilding, ship repair and marine cargo handling facilities in Norfolk were located in M-2 or M-3 zones. Finally, Doran alleged that it had no desire nor need to locate near navigable waters or near any enterprise engaged in maritime activity.
 
 
 8
 The LHWCA, as in effect at the time of Davis' injury, provided that:
 
 
 9
 Compensation shall be payable under this Act in respect to disability or death of an employee but only if the disability or death results from an injury occuring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing or building a vessel).
 
 
 10
 33 U.S.C.A. Sec. 903(a) (1970 Ed.,Supp.V). In interpreting this Section, the Supreme Court has ruled that the language of the LHWCA is broad and should be liberally construed in order to avoid any harsh results under this remedial type of legislation. P.C. Pfeiffer Co., Inc. v. Ford, 444 U.S. 69, 74, 100 S.Ct. 328, 333, 62 L.Ed.2d 225, 230 (1979); Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 267-68, 97 S.Ct. 2348, 2359, 53 L.Ed.2d 320 (1977). Consequently, the Court has taken an expansive view towards the LHWCA in order to extend coverage. Nevertheless, even with this expansive view in mind, the Supreme Court has clearly stated that "there will always be a boundary to coverage, and there will always be people who cross it during their employment." Herb's Welding, Inc. v. Gray, 470 U.S. 414, 426, 105 S.Ct. 1421, 1429, 84 L.Ed.2d 406, 414 (1985). Unfortunately, those outer boundaries have never been dispositively set.
 
 
 11
 The Fourth Circuit has previously struggled with this jurisdictional situs test in Humphries v. Director, OWCP, 834 F.2d 372 (4th Cir.1987). In Humphries, a maritime employee left the maritime terminal at which he was employed to get a meal for an overtime employee. While en route to the restaurant, he was injured in a car accident approximately 1 1/2 miles from the terminal. Id. at 373. In ruling that Humphries did not satisfy the situs test, this court acknowledged that "a covered situs need not be used exclusively for maritime purposes or be within any specified distance of navigable waters or a 'maritime operation' " in order to qualify as a maritime situs under the LHWCA. Id. at 373-74. Nevertheless, this court also recognized that geographical boundaries do exist and therefore rejected the Third Circuit's former rule which merged the situs requirement into that of status providing that so long as a worker is engaged in maritime employment, his physical location is irrelevant. See Sea-Land Service, Inc. v. Director, OWCP, 540 F.2d 629, 636-639 (3rd Cir.1976).
 
 
 12
 Other circuits have focused on the functional relationship between an area and marine activity in deciding whether the area is governed by the LHWCA. See Motoviloff v. Director, OWCP, 692 F.2d 87 (9th Cir.1982) (although a refurbishing facility was only 750 feet from water, since it was 12 miles from the company's main loading and unloading facility and bore no functional relationship to that primary facility, the refurbishing facility was held to not satisfy the situs requirement); Texports Stevedore Co. v. Winchester, 632 F.2d 504 (5th Cir.1980), cert. denied, 452 U.S. 905 (1981) ("The perimeter of an area is defined by function ... The statute does not require that the area's exclusive use be for maritime purposes so long as it is customarily used for significant maritime activity."). The court in Humphries approvingly cited the Ninth Circuit approach to determining situs boundaries enunciated in Brady-Hamilton Stevedore Co. v. Herron, 568 F.2d 137 (9th Cir.1987). Under Brady-Hamilton, a court should employ a four-pronged factual analysis test in determining if an area is maritime. These four factors are:
 
 
 13
 the particular suitability of the site for the maritime uses referred to in the statute; whether adjoining properties are devoted primarily to uses in maritime commerce; the proximity of the site to the waterway; and whether the site is as close to the waterway as is feasible given all of the circumstances in the case.
 
 
 14
 Id. at 141. Consequently, although no comprehensive test has been offered by this Circuit, it is clear that the issue of maritime situs depends on the evaluation of specific facts and not merely the application of a bright-line rule.
 
 
 15
 In reviewing the evidence, we conclude that the BRB's decision was correct. Doran's place of business did not front on any water, but Doran's facility was approximately one mile by air and two miles by street from the nearest water. The BRB found that the area in which Doran was located was essentially non-maritime as indicated by the presence of non-maritime business, such as a bottling company, a linen service, an autobody shop, a public park, office buildings and residential housing. If the area in which Doran was located were classified as a maritime area, then almost everything in the Norfolk-Newport News area would qualify as such an area. Both the BRB and the ALJ decided that the site was not chosen for its proximity to navigable waters. The structure was chosen simply because it would contain an overhead crane and would permit the movement of ship propellers throughout the facility. Its proximity to water was merely fortuitous. Although the site possibly could have accommodated a shipbuilding enterprise, that fact, in and of itself, does not mean that it is a maritime situs.
 
 
 16
 Although Congress intended the provisions of the LHWCA to be interpreted expansively, it did not mean the coverage to be limitless. The BRB determined the area, in which Doran was located, not to be primarily devoted to maritime commerce and we should afford some deference to its decision because of the factually intensive nature of that issue. Although the present facts indicate that Doran's facility was close to the boundary, it nevertheless crossed it and was not a maritime situs. Consequently, the decision below is
 
 
 17
 AFFIRMED.
 
 
 
 [1]
 The LHWCA was subsequently amended by Public Law 98-426 stat. 1639, effective September 28, 1984. By directive contained therein, Section 28(a)-(g), 98 stat. 1655, amendments to Section 903 of the LHWCA are to apply with respect to an injury occuring after the date of enactment of the amendments (September 28, 1984). Therefore, since Davis' injuries occurred on September 28, 1977, prior to enactment of the 1984 amendments, the statutory language of Section 903 as enacted in 1972 would control the determination herein