**John F. HARMON, Appellant,**

v.

**BALTIMORE & OHIO RAILROAD.**

No. 83–1532.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1984.

Decided Aug. 17, 1984.

J. Michael Farrell, Washington, D.C., of the Bar of the District of Columbia Court of Appeals *pro hac vice* by special leave of the Court, with whom Kurt C. Rommel, Washington, D.C., was on the brief, for appellant.

George F. Pappas, Baltimore, Md., of the Bar of the Court of Appeals for Maryland pro hac vice by special leave of the Court, with whom Walter J. Smith, Jr., Washington, D.C., was on the brief, for appellee.

Before WRIGHT, MIKVA and BORK, Circuit Judges.

MIKVA, Circuit Judge:

A recurring problem in workers' compensation laws has been the coverage of maritime workers. Commencing in 1917, when the Supreme Court held that under certain circumstances states could not constitutionally provide compensation to injured maritime workers, *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), Congress, the courts, and the states have struggled to carve out rational areas for state and federal laws. The original *"Jensen* line", named after that 1917 case, held that the states could not cover longshoremen injured seaward of the water's edge. In 1927, after several unsuccessful attempts to extend state compensation remedies to injured maritime workers, Congress enacted the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et seq.* (1982), to provide coverage for such precluded longshoremen and others similarly situated. That statute, significantly amended in 1972, has been intersected by other federal compensation laws. We here address the application of the LHWCA, as amended in 1972, to the facts in this case and the interface, if any, between that Act and the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.* (1982).

John Harmon, appellant, was employed by the Baltimore and Ohio Railroad Company (B & O) at its coal pier in Baltimore. He was injured while repairing a hopper, or funnel, through which coal passes as it

moves from railroad cars to the holds of barges and ships. Subsequently, Harmon applied for, and received benefits under the LHWCA. Thereafter, Harmon also brought suit under the FELA, contending that his injuries resulted from B & O's negligence. There is no dispute concerning either the injury itself or the location where the injury occurred. The sole dispute is whether LHWCA is to provide the exclusive remedy due Harmon for his injury. The District Judge found that the LHWCA covered Harmon's injury and was his exclusive remedy. Accordingly, the court granted summary judgment to B & O, 560 F.Supp. 914. We affirm.

## I. BACKGROUND

The Longshoremen's Act was adopted in 1927 to provide federal compensation for maritime workers injured upon "navigable waters." Since the Act's inception, coverage under the LHWCA has been exclusive, at least to some degree. In part, this exclusivity traces directly to the statute. For example, section 905 of the LHWCA always spoke of an employer's liability as exclusive. 33 U.S.C. § 905 (1982). In part, this exclusivity traces to judicial decisions. For example, the rationale of *Jensen* taught that, since federal admiralty jurisdiction over navigable water was exclusive, a state was without power to compensate a longshoreman injured on the seaward side of the water's edge.

At the same time, however, federal compensation under the LHWCA initially did not extend to all maritime employees injured on navigable waters in the course of their employment. Where the worker's employment could be characterized as "maritime but local," the LHWCA did not apply and, accordingly, state compensation schemes were not precluded. *See, e.g., Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *see generally Director, Office of Workers' Compensation Programs, United States Department of Labor v. Perini North River Associates,* 459 U.S. 297, 103 S.Ct. 634, 642, 74 L.Ed.2d 465 (1983). The "maritime but local" exception was based on section 3(a) of the 1927 Act, which allowed federal compensation only if compensation "may not validly be provided by State law." This exception, however, created more uncertainty than equity. Numerous cases thus sought to ameliorate the impact of the "maritime but local" exception which placed employees and employers alike on the "horns of a jurisdictional dilemma." *Davis v. Department of Labor and Industries,* 317 U.S. 249, 255, 63 S.Ct. 225, 228, 87 L.Ed. 246 (1942). Since the distinction that could be drawn varied from state compensation law to state compensation law, from court to court, and from case to case, it became a most insoluble dilemma: it was virtually impossible to synthesize from the cases any real guidelines as to when compensation would be available under either compensatory scheme. The courts increasingly leaned toward finding coverage under the LHWCA without devoting sufficient time either to ferret out the intricacies of state law or to apply the unique employment and injury facts to those intricacies. The legal topography, then, in 1972 was one in which uncertainty was the predominant feature of maritime workers' compensation.

In 1972, Congress amended the LHWCA. 44 Stat. 1424, as amended, 86 Stat. 1251, 33 U.S.C. § 901 *et seq.* These amendments represented Congress' "first significant effort to reform the 1927 Act and the judicial gloss that had been attached to it." *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 261, 97 S.Ct. 2348, 2356, 53 L.Ed.2d 320 (1977). Although the 1972 amendments did not explicitly expand the exclusivity doctrine of earlier versions of the LHWCA, the amendments modified the definitions pertaining to coverage. Section 3(a) was amended to delete the restriction on claims cognizable under state law. Instead, the amendments included a limitation that compensation was payable

only if the disability or death results from an injury occurring upon the navigable waters of the United States (includ-

ing any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).

33 U.S.C. § 903(a) (1982). This provision has been referred to as the situs test. The statute also provided that:

The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.

33 U.S.C. § 902(3) (1982). This, in turn, is the status test. An employee is covered by the LHWCA only if he or she meets both the situs and the status tests. *P.C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 73–74, 100 S.Ct. 328, 332, 62 L.Ed.2d 225 (1979).

The parties agree that Harmon was injured within the appropriate situs. The sole dispute then is whether Harmon satisfies the status test: whether he was "engaged in maritime employment" at the time of his injury. If Harmon satisfies both the status and situs tests, then he is within the jurisdiction of the LHWCA.

## II. ANALYSIS

Like most of the difficult cases that have provided so much legal hair-splitting about this relatively narrow area of the law, Harmon's employment is not easy to categorize, at least at first blush. At the coal pier where he was injured, coal is unloaded from railroad cars onto oceangoing vessels through a highly specialized process. Various pieces of equipment move, sort, and homogenize the coal until it passes from various conveyor belts into a chute that leads to the hold of the barge or ship being loaded. At least half of Harmon's duties consisted of the maintenance and repair of these various pieces of equipment. In addition, Harmon spent time performing and

supervising carpentry and maintenance work on other buildings and structures at the pier yard. Harmon received his injury while repairing one of the hoppers or funnels through which coal passes during the shiploading process. Harmon, who wants *not* to be under the exclusive coverage of LHWCA for purposes of this litigation (although the record shows that Harmon already has received benefits under LHWCA, a circumstance which B & O argues should constitute a binding election of remedies by Harmon), insists that his duties were the quintessence of railroad work since he was repairing equipment that unloads railroad cars. Harmon thus asserts that his duties should be characterized as essential to the "traditional railroading task of unloading railroad cars" and, accordingly, should be outside the scope of the LHWCA. We reject this argument and instead conclude that Harmon's injury is covered by the LHWCA. Indeed, the "traditional railroading task" determination, upon which Harmon so heavily relies, is not dispositive of the issue of coverage under the LHWCA. Even if that test were dispositive, the task Harmon was performing at the time of his injury was at least as essential to the traditional longshoreman's work in loading ships as it was to the railroad worker's task in unloading railroad cars. The distinction between loading ships—clearly within the ambit of the LHWCA—and unloading railroad cars is, as the district court pithily observed, "purely semantic." The coverage under LHWCA cannot turn on such gossamer strands.

The 1972 amendments modified both the situs and the status components of the LHWCA. These modifications, however, were interrelated. As regards the situs component, the LHWCA substantially extended LHWCA's reach shoreward. *See P.C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979). The broadened situs test provided compensation under the LHWCA whether the injury occurred on navigable water or on any other adjoining area customarily used by the employer in loading, unloading, repairing, or

rebuilding a vessel. 33 U.S.C. § 903 (1982). The *Jensen* line thus was totally abandoned as a limitation on federal coverage.

Because Congress expanded the situs in which the LHWCA applied, it "became necessary to describe affirmatively the class of workers Congress desired to compensate." *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 264, 97 S.Ct. 2348, 2357, 53 L.Ed.2d 320 (1977). Congress thus added the requirement that the worker be "engaged in maritime employment." Clearly then, Congress did not intend to extend LHWCA coverage to all workers within the boundaries of the newly-expanded "navigable waters." Unfortunately, neither the language nor the legislative history is exceedingly explicit in explaining the changes made to the status test. For example, Congress provided no definition in either text or legislative history for the terms "maritime employment", "longshoremen", or "longshoring operations." *Id.* at 265, 97 S.Ct. at 2358.

The courts, however, have had numerous opportunities to address this issue. To these cases we turn for guidance. In *Northeast Marine Terminal,* the Supreme Court held that two employees involved with the movement of cargo between ships and land transportation were within the scope of the LHWCA. The Court noted that "[o]ne of the primary motivations for Congress' decision to extend the coverage shoreward was the recognition that 'the advent of modern cargo-handling techniques' had moved much of the longshoreman's work off the vessel and onto land." *Id.* at 269–70, 97 S.Ct. at 2360. Where longshoremen previously had performed all loading and unloading tasks about the ships, new shipping technologies, such as containerization, permitted most of such tasks to be performed on dry land, sometimes far distant from shipside. Focusing on the remedial purposes underlying the 1972 amendments, and considering congressional awareness of the technological innovations in shipping, the Court concluded that the LHWCA covered those tasks that are "clearly an integral part of the unloading process," *id.* at 271, 97 S.Ct. at

2361, even if such tasks are performed wholly on land. The Court reasoned that Congress had intended to "cover those workers involved in the essential elements of unloading a vessel," but to leave outside the scope of the LHWCA employees "who are on the situs but are not engaged in the overall process of loading and unloading vessels." *Id.* at 267, 97 S.Ct. at 2359.

*Northeast Marine Terminal* also rejected the "point-of-rest" doctrine under which it was argued that maritime employment covered only activities that transpired prior to the good's "first point of rest." At that point, the theory ran, stevedoring operations ended and terminal operations began. Accordingly, a worker would be covered or uncovered depending on when he handled the cargo. The Court found that such a doctrine, however useful to union jurisdictional concerns, was absent from the legislative history and was inconsistent with the broad purposes of the 1972 amendments. *Id.* at 274–79, 97 S.Ct. at 2362–65. The basic purpose of the 1972 amendments, said the Court, was to avoid the anomaly of workers walking in and out of coverage depending on where they were standing when the injury occurred. A worker, the Court indicated, was covered under LHWCA whether he first handled cargo on the ship, on the dock, or on a nearby pier.

The Court revisited the meaning of the term "maritime employment" in *P.C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979). There, the Court held that "[p]ersons moving cargo directly from ship to land transportation are engaged in maritime employment. ... A worker responsible for some portion of that activity is as much an integral part of the process of loading and unloading a ship as [is] a person who participates in the entire process." *Id.* at 82–83, 100 S.Ct. at 337. In supporting this conclusion, the Court emphasized that "Congress intended to apply a simple, uniform standard of coverage." *Id.* at 83, 100 S.Ct. at 337.

Most recently, the Supreme Court again addressed the status component of the

LHWCA in *Director, Office of Workers' Compensation Programs, United States Department of Labor v. Perini North River Associates,* 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983). In *Perini,* the Court reviewed the tortuous struggle to develop a sensible policy of coverage for workers injured on or about navigable waters. The thorough review of pre-1972 cases which moved Congress to action revealed a legislative intent to expand coverage under the LHWCA so as to eliminate many of the pointless distinctions and dilemmas created by the *Jensen* case and its progeny. In sum, said the Court, the 1972 amendments were expected to enlarge the coverage of LHWCA, and efforts to judicially crimp its coverage were to be resisted.

It is true that none of the Supreme Court cases since the 1972 amendments specifically define maritime employment to cover Harmon's job with B & O. These decisions, however, indicate that the term "maritime employment" is to be broadly defined. *See, e.g., Northeast Marine Terminal Co. v. Caputo,* 432 U.S. at 268, 97 S.Ct. at 2359 ("The language of the 1972 Amendments is broad and suggests that we should take an expansive view of the extended coverage."). The description of maritime employment most relevant to the case *sub judice* was articulated in *Pfeiffer,* where the Court found coverage under LHWCA because the employees were "engaged in intermediate steps of moving cargo between ship and land transportation." 444 U.S. at 83, 100 S.Ct. at 337. In general, the Supreme Court's decisions make clear that maritime employment is not limited to workers wearing badges as longshoremen, and that a definition of maritime employment need not preclude workers who also perform some railroad tasks.

Other courts of appeals have faced cases strikingly similar to the case under consideration here. In those cases, the other circuits have applied the *Pfeiffer* definition of maritime worker and have found that the LHWCA covers employees who maintain and repair the equipment used in moving cargo between ships and land transpor-

tation. For example, in *Graziano v. General Dynamics Corp.,* 663 F.2d 340 (1st Cir.1981), the First Circuit held that the LHWCA covered an employee who maintained the structures that housed shipyard machinery. In *Hullinghorst Industries, Inc. v. Carroll,* 650 F.2d 750 (5th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982), the Fifth Circuit held that the LHWCA covered a carpenter who was injured while constructing a scaffold for other employees to use in the repair of machinery. "This court has made it clear that the maintenance and repair of tools, equipment, and facilities used in indisputably maritime activities lies within the scope of 'maritime employment' as that term is used in the Act." *Id.* at 755. In *Price v. Norfolk and Western Ry. Co.,* 618 F.2d 1059 (4th Cir.1980), the Fourth Circuit held that a railway employee injured while painting the support structure of equipment used to load grain onto ships was covered by the LHWCA. A linchpin in the court's analysis was the fact that the repair of machinery and equipment essential to the movement of maritime cargo was covered by the LHWCA. *Id.* at 1061. And, in *Garvey Grain Co. v. Director, Office of Workers' Compensation Programs,* 639 F.2d 366 (7th Cir.1981), the Seventh Circuit held that the LHWCA applied to employees performing general maintenance at a grain loading facility. The court reasoned: "These functions are an integral part of the loading and unloading of vessels and are directly connected with and are vital to the movement of maritime cargo on navigable waters." *Id.* at 370.

Against this background, the district court's conclusion that Harmon's injury was covered by the LHWCA is unassailable. At the time of his injury, Harmon was repairing and maintaining equipment used in indisputably maritime activities—that is, the loading of ships. That equipment thus was essential to the movement of maritime cargo from the trains to the ships. Accordingly, the repair and maintenance of that equipment must also be considered as an integral part in the loading and unloading

of ships. *See generally Hullinghorst Industries*, 650 F.2d at 755. We can draw no meaningful distinction between the jobs that other circuits have found to be within the scope of the LHWCA and Harmon's job. As in those cases, Harmon's functions were an integral part of the process of unloading and loading vessels and were vital to the movement of maritime cargo on navigable waters. The precedents cited above, both from the Supreme Court and from the other circuits, doom Harmon's efforts to create a new set of conundrums out of the status guidelines established by the 1972 amendments. We therefore affirm the district court's conclusion that Harmon's injury is covered under the LHWCA.

The holding in *Conti v. Norfolk & Western Ry. Co.*, 566 F.2d 890 (4th Cir.1977), cannot provide the comfort Harmon seeks to derive from it. The court there held that railroad brakemen who worked in a shipyard were not covered by LHWCA because the employment was identical to that of railroad brakemen everywhere. "It is clear that ... the occupations of the plaintiffs were not of a traditionally maritime nature, but on the contrary were those traditionally associated with railroading." *Id.* at 895. In reaching this conclusion, the *Conti* court relied on a definition of maritime employment which required that the employee's task have a "realistically significant relationship to 'traditional maritime activity involving navigation and commerce on navigable waters.'" *Id.* (quoting *Weyerhaeuser Co. v. Gilmore*, 528 F.2d 957, 961 (9th Cir.), *cert. denied*, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976)). In the instant case, because Harmon worked on equipment that was an integral part of loading and unloading operations, his job had a significant relationship to traditional maritime activities. In that sense, Harmon was engaged in the type of duties that longshoremen perform in transferring goods between ships and land transportation. Thus, *Conti* is inapposite.

■ In any event, we decline to follow *Conti* to the extent that it may suggest

that a simple distinction between "traditional railroading tasks" and "traditional maritime tasks" should be the sole inquiry in determining an employee's status under the LHWCA. That distinction, we believe, smacks too much of the rigidity that the 1972 amendments sought to eliminate from the coverage mechanisms of LHWCA. The 1972 amendments reflected a congressional reaction, at least in part, to the fact that modern technology has made traditional job descriptions and labels unhelpful to the task of fashioning a rational compensation scheme for injured workers. Thus, it is not enough for a court merely to state summarily that an employee's job description or duties are similar to duties that railroad employees traditionally have performed, without first asking how those duties today relate to the operations of the harbor or pier. Our conclusion to not rest on that distinction is bolstered by the fact that none of the cases cited above applied the analysis that Harmon urges. Significantly, the Fourth Circuit itself seems to have moved away from using the distinction between "traditional railroading tasks" and "traditional maritime tasks" as the sole inquiry, or the dispositive issue in LHWCA cases. Thus, for example, in *Caldwell v. Ogden Sea Transport Inc.*, 618 F.2d 1037, 1050 (4th Cir.1980), *Conti* was cited only for the proposition that coverage under the LHWCA turned on whether the claimant was an "integral part of the unloading process." And, in *Price v. Norfolk & Western Ry. Co.*, the court never discussed the distinction between "traditional railroading tasks" and "traditional maritime tasks." *See also Vogelsang v. Western Maryland Ry. Co.*, 670 F.2d 1347, 1348 (4th Cir.1982) (distinguishing *Conti*).

Harmon next argues that even if he is covered under the LHWCA—which we hold he is—the provision making that statute the exclusive remedy for job-related injuries does not apply to railway employees, like Harmon, whose injuries would have been covered under FELA prior to the 1972 amendments to LHWCA. Harmon contends that only an express repeal by Congress of the pre-existing FELA coverage

could deprive him of FELA coverage. Such an interpretation of the legislative process is as novel as it is static. Congress need not contemplate every jot and tittle of impact before it passes a statute; nor can the courts freeze existing statutes so as to avoid the clear intention of Congress to change the interplay of statutes one to another. Admittedly, prior to 1972 Congress provided workers' compensation under FELA for injuries such as Harmon's. The authority of Congress to change such coverage, however, whether by direct amendment of FELA or by expanding coverage under LHWCA, is beyond the challenge Harmon seeks to make.

Finally, Harmon urges that since coverage under LHWCA, as amended in 1972, has not necessarily precluded coverage under state workers' compensation laws, he similarly should be allowed to pursue remedies under both FELA and LHWCA. We reject this argument. Section 5 of LHWCA specifically provides that the liability of an employer under the Act "shall be exclusive and in place of all other liability of such employer to the employee." 33 U.S.C. § 905(a) (1982). In *Nogueira v. New York, New Haven & Hartford R.R. Co.*, 281 U.S. 128, 130–31, 50 S.Ct. 303, 74 L.Ed. 754 (1930), the Supreme Court specifically held that the language must be given its plain meaning and that the remedy under LHWCA is exclusive. In *Pennsylvania R.R. Co. v. O'Rourke*, 344 U.S. 334, 338, 73 S.Ct. 302, 304, 97 L.Ed. 367 (1952), the Court reiterated this holding, stating that FELA could not apply to a case where LHWCA provided coverage. Harmon makes no effort to distinguish the clear language of Section 5 and the explicit holdings of these cases. Indeed, were we to adopt Harmon's argument, therein ignoring the holdings of *Nogueira* and *O'Rourke*, Section 5 would be deprived of any meaning whatsoever.

It is true, as Harmon argues, that in *Sun Ship, Inc. v. Pennsylvania*, 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980), and other cases, the Court has held that the effect of the 1972 amendments might well allow overlapping coverage between LHWCA and state compensation laws. This conclusion largely stemmed from the removal of the language in Section 3(a) of the pre–1972 Act which provided, in pertinent part, that "[c]ompensation shall be payable [for an injury] ... occurring upon the navigable waters of the United States ... if recovery ... through workmen's compensation proceedings may not validly be provided by State law." The extension of federal jurisdiction that followed this amendment to section 3(a), the Court held, supplemented rather than supplanted state compensation laws. This holding, however, does not further Harmon's cause. It would be a large and insupportable leap in logic to jump from a holding that permitted concurrent state and federal jurisdiction to a holding that permitted simultaneous coverage under two distinct federal statutes, especially given that the express language of Section 5 unequivocally states that liability of an employer under LHWCA shall be "exclusive and in place of all other liability." Moreover, a critical basis for the Court's conclusion in *Sun Ship* was its observation that "the pre-1972 Longshoremen's Act ran concurrently with state remedies in the 'maritime but local' zone." 447 U.S. at 720, 100 S.Ct. at 2436. In stark contrast, the remedies available under the FELA *never* ran concurrently with the LHWCA. *See, e.g., O'Rourke, supra; Nogueira, supra.* We thus find no tension between the holdings that overlap is permissible between the LHWCA and state compensation schemes and the district court's holding that coverage under the LHWCA precludes coverage under the FELA.

### III. CONCLUSION

In sum, we hold that the LHWCA covers Harmon's injury, and that coverage under that Act precludes coverage under the FELA. Accordingly, the district court's decision to grant summary judgment in favor of the employer is

*Affirmed.*