**George R. STOWERS, Plaintiff–Appellant,**

**v.**

**CONSOLIDATED RAIL CORPORATION, Defendant–Appellee.**

No. 92–3177.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 10, 1992.

Decided Feb. 8, 1993.

Rehearing and Rehearing En Banc Denied April 6, 1993.

Joel Levin, Marshall I. Nurenberg (argued and briefed), Nurenberg, Plevin, Heller & McCarthy, Cleveland, OH, for plaintiff-appellant.

William F. Gibson (argued and briefed), Gallagher, Sharp, Fulton & Norman, Cleveland, OH, for defendant-appellee.

Before: JONES and RYAN, Circuit Judges; and BROWN, Senior Circuit Judge.

RYAN, Circuit Judge.

Plaintiff George R. Stowers appeals the district court's grant of summary judgment for defendant Consolidated Rail (ConRail) in this negligence action brought under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51 *et seq.* The district court ordered summary judgment on the ground that the action is not within the district court's subject matter jurisdiction because Stowers's exclusive remedy against his employer is under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901 *et seq.*

The issues on appeal are whether Stowers was a "maritime employee" within the meaning of the LHWCA; whether the area where plaintiff was injured is a "covered

situs" under the LHWCA; and whether ConRail is a "maritime employer" under the LHWCA. We conclude that Stowers was not an employee engaged in "maritime employment" as defined by the LHWCA, and that he has no cause of action, therefore, under the LHWCA. Accordingly, we shall reverse the decision of the district court and remand with instructions to permit the plaintiff to proceed pursuant to the FELA.

## I.

George Stowers began working as an engineer and fireman for ConRail in 1950. In 1989, he was transferred to ConRail's Ashtabula Harbor Yard in Ashtabula, Ohio, to work as a locomotive engineer for a ConRail switching crew. Harbor Yard is a railroad switching yard that services two loading dock companies, ConRail Coal Dock Company and Pinney Dock Company. ConRail owns the yard, the switching facilities, and the ConRail Coal Dock Company.

During the period in question, railroad cars filled with coal were brought to the yard via the railroad. Once the coal-filled cars reached the yard, Stowers, as the locomotive engineer of the switchyard crew, reassembled the cars to make up new trains that he then pulled to the docks. At the dock, Stowers would lock the coal-filled cars into mechanical "dumpers," and ConRail Coal Dock employees would operate the dumpers to dump coal onto the conveyor belts that carried the coal directly to the ships. Stowers would then pull the empty cars back to the yard. In addition, when incoming ships loaded with iron ore arrived, Stowers would bring a train of empty cars to the dock where Pinney Dock employees would fill the rail cars with iron ore. Stowers, or members of his crew, would then haul the loaded cars back to the yard. All of the loading equipment was operated and maintained by coal dock employees. Stowers's only contact with the loading equipment was to position rail cars in the dumpers and to haul them away.

Stowers also worked on the yard's "back track," an area of the yard used for train classification and separating railroad cars

in need of repair. On March 21, 1991, while working in the back track area, Stowers was injured when his locomotive rode over a portable derailer while he was separating rail cars in need of repairs.

Stowers filed suit against his employer ConRail under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 *et seq.*, to recover for his work-related injuries. ConRail moved for summary judgment on the basis that the district court lacked subject matter jurisdiction over the dispute because Stowers's exclusive remedy was under the Longshore Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.* The district court found that although Stowers was a railroad employee, he was engaged in "maritime employment," as defined under the LHWCA, because he was an "integral and essential" part of the loading and unloading of the vessels. The district court also found that the harbor yard, including the back track, was a "maritime situs" under the LHWCA. Consequently, the court ruled that Stowers's cause of action arose under the LHWCA, which provided his exclusive remedy. The court granted summary judgment for ConRail, and Stowers filed this timely appeal.

## II.

We review the district court's grant of summary judgment *de novo*. *EEOC v. University of Detroit*, 904 F.2d 331, 334 (6th Cir.1990).

The LHWCA provides the exclusive remedy for an employee who is subject to the Act's provisions and who is injured on the job. 33 U.S.C. § 905(a). LHWCA claims must be brought through an administrative procedure, with appeals heard by administrative law judges. 33 U.S.C. § 919 *et seq.* Federal district courts have jurisdiction to enforce the ALJ orders but lack jurisdiction to adjudicate initial LHWCA claims. 33 U.S.C. § 921(d).

The LHWCA extends coverage to all employees, including railroad employees, if the following four elements are met:

1) the injured person must be injured in the course of his employment, 33 U.S.C. § 902(2);

2) his employer must have employees who are employed in maritime employment, § 902(4);

3) the injury must occur "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)," § 903(a); and

4) the employee who is injured within that area must be engaged in maritime employment, § 902(3).

*Chesapeake & Ohio R.R. Co. v. Schwalb,* 493 U.S. 40, 45, 110 S.Ct. 381, 384, 107 L.Ed.2d 278 (1989). The Supreme Court has required that these elements be "liberally construed" so that coverage under the LHWCA is extended to all workers on the maritime situs who are involved in the "essential or integral elements of the loading and unloading of the vessels." *Id.* at 46, 110 S.Ct. at 385.

The parties do not dispute that Stowers's injury occurred in the course of his employment. However, they dispute whether Stowers was engaged in "maritime employment"; whether ConRail was an "employer" as defined by the LHWCA; and whether the area where Stowers was injured was a "situs" covered by the LHWCA.

The LHWCA defines an "employee" as: any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker....

33 U.S.C. § 902(3). Because Congress did not expressly define "maritime employment," the Supreme Court has looked to the legislative history of the LHWCA to assist in determining whether an employee falls under the Act's provisions. *See Northeast Marine Terminal Co., Inc. v. Caputo,* 432 U.S. 249, 257–65, 97 S.Ct. 2348, 2353–57, 53 L.Ed.2d 320 (1977). Prior to 1972, the LHWCA covered only those classes of longshoreman and other maritime employees who were injured while on or over the navigable waters of the United States. This resulted in the anomalous situation whereby "amphibious" workers, that is workers who performed some duties on maritime vessels and some on dry land, found themselves "walk[ing] in and out of [LHWCA] coverage," *P.C. Pfeiffer v. Ford,* 444 U.S. 69, 76, 100 S.Ct. 328, 334, 62 L.Ed.2d 225 (1979), depending on where they were working at the time of the injury. Moreover, advances in loading and unloading technologies, such as the conveyor systems used to load maritime cargo directly on or off vessels from or to land-based locations, meant that much of the traditional longshoring work that the LHWCA was intended to cover was moved inland. Thus, certain longshore workers might never set foot onto a ship or, as a result, "into coverage." To remedy these anomalies and to assure that maritime workers received the protection of the LHWCA regardless of where their work-related injuries occurred, Congress amended the statute in 1972. In so doing, Congress broadened the covered situs by extending coverage inland. However, in an apparent trade-off, it reduced the scope of covered occupations to those employees who worked for "maritime employers" and who were injured on a covered situs while engaging in "maritime employment." *Schwalb,* 493 U.S. at 46, 110 S.Ct. at 305.

■ The Supreme Court reacted to the 1972 amendments, by holding, as we have said, that the act is to be "liberally construed and that the LHWCA, as amended, cover[s] all those on the situs involved in the essential or integral elements of the loading or unloading process." *Id.* (citing *Caputo,* 432 U.S. at 267, 97 S.Ct. at 2358). Thus, the definition of "maritime employment" reaches not only traditional longshoreman-type work, but it also reaches railroad workers who engage in tasks traditionally performed by longshoremen. Applying the test liberally, the Supreme Court has held that workers performing even one integral part of the loading or unloading process are covered by the LHWCA. *P.C.*

*Pfeiffer,* 444 U.S. at 82, 100 S.Ct. at 337. The Supreme Court also held, in *Schwalb,* that railroad employees who are injured while maintaining or repairing equipment that is essential to the loading or unloading process are also covered by the LHWCA. *Schwalb,* 493 U.S. at 47, 110 S.Ct. at 385; *see also Kelly v. Pittsburgh & Conneaut Dock Co.,* 900 F.2d 89 (6th Cir.1990).

ConRail characterizes Stowers's duties as part of the overall loading and unloading of maritime vessels. According to ConRail, the process for loading the ships begins when the yard crew takes over the railroad cars from the ground crew, while the loading process ends when the yard crew leaves the empty cars with the road engineer. ConRail argues that, without the switchyard crew, the loading and unloading of ships would cease; therefore, the crew's duties play an "integral and essential part" in the loading process and constitute maritime employment. Stowers, in contrast, argues that the Con-Rail yard crew members perform typical railroad functions that they would perform at any switchyard facility, and he characterizes the yard crew's duties as part of the land transportation process rather than as part of the ship-loading process.

Stowers relies primarily on *Conti v. Norfolk & W. Ry. Co.,* 566 F.2d 890 (4th Cir. 1977), a case involving facts similar to ours, in which the Fourth Circuit found that the plaintiff was not a maritime employee. In *Conti,* the yard crew was responsible for bringing railroad cars full of coal to the mechanical dumpers. These dumpers dumped the coal onto a conveyor belt that led to the ship loaders. The yard crews also took the empty cars out of the dumping area and reassembled them into trains for the return trip. The Fourth Circuit found that the yard crew employees were not engaged in the "integral part of the unloading" process and thus did not fall within the coverage of the LHWCA. The court stated:

It is clear that ... *the occupations of the plaintiffs were not of a traditionally maritime nature,* but on the contrary were those traditionally associated with railroading. Their tasks and responsibilities with respect to the unloading of the coal from the hopper cars would have been the same at an inland terminal as they were at Lamberts Point, and *the sophisticated automation of the facilities at the latter terminal should not obscure the basic fact that the plaintiffs were engaged in unloading a coal train, not loading a vessel.* We find nothing in the Amendments or the legislative history to indicate that under these circumstances the Congress intended to transfer the redress of such injured railroad workers from the FELA to the Longshoremen's Act.

*Conti,* 566 F.2d at 895 (emphasis added). Similarly, Stowers argues, the switchyard crew at Harbor Yard performs the same function it would have performed at any other industrial switching facility. Stowers points out that, at each switching facility, "the switching operation is the first or final stage in the overland transportation, and not an adjunct of the loading or unloading by the recipient of the cargo." Therefore, according to Stowers, the switchyard crew members fit the Supreme Court's example of workers "whose dockside duties do not fall within the ambit of the LHWCA."[1]

Conceding that *Conti* has never been overruled, ConRail argues that the basis of the *Conti* decision is contrary to the Supreme Court's more recent guidance in *Schwalb,* which rejects the distinction between traditional railroad tasks and traditional maritime tasks as the sole test for determining LHWCA coverage. *Schwalb,* 493 U.S. at 48, 110 S.Ct. at 385. The *Schwalb* Court stated:

It makes no difference that the particular kind of repair [plaintiff] was doing might be considered traditional railroad work or might be done by railroad em-

---

1. For example, in *Caputo,* the Supreme Court stated:

[E]mployees such as truckdrivers, whose responsibility on the waterfront is essentially to pick up or deliver cargo unloaded from or destined for maritime transportation are not covered.

432 U.S. at 267, 97 S.Ct. at 2358.

ployees wherever railroad cars are unloaded. The determinative consideration is that the ship loading process could not continue unless the [equipment] that [plaintiff] worked on was operating properly.

*Id.* Similarly, ConRail argues, it does not matter whether the work performed by Stowers is considered traditional railroad work. If Stowers's duties were an essential part of the ship-loading process and if the ship loading or unloading process could not continue without Stowers, then he is considered a maritime employee under the LHWCA.

We disagree. The *Conti* court refused to extend coverage of the LHWCA to the plaintiffs because it found that the plaintiffs were not engaged in work "traditionally maritime" and were, instead, "engaged in the unloading of a coal train, not loading a vessel." *Conti*, 566 F.2d at 895. Like the plaintiffs in *Conti*, Stowers's duties stopped at the dock and did not involve loading or unloading a vessel. Although the D.C. Circuit has rejected the distinction between loading ships and unloading rail cars,[2] we believe that the LHWCA, as interpreted by the Supreme Court, requires us to focus, as the *Conti* court did, on the nature of the plaintiff's occupation; in so doing, we are led to conclude that there is a meaningful distinction between loading or unloading ships and loading or unloading rail cars.

This approach is consistent with our finding of "maritime employment" in *Warren Bros. v. Nelson*, 635 F.2d 552 (6th Cir. 1980), where we held that the plaintiff's work in trucking gravel from shipside to a nearby storage pile adjacent to his employer's factory was an integral part of the "overall process" of unloading the barges. In that case, gravel was unloaded from the barges into a shipside hopper. We found that the movement from barge to hopper was the first step of the vessel-loading process and that the unloading required a second step, from hopper to stockpile via truck. "The two steps form a unified [un-

loading] process." *Id.* at 555. In contrast, the loading (or unloading) of the ships at Ashtabula Yard began (or ended) with the rail cars at the dumpers.

Moreover, it is significant here, that Stowers did not participate in the loading or unloading of the rail cars; he merely delivered the cars to the loading and unloading site, and later hauled them away.

We reject ConRail's argument that we should extend LHWCA coverage in this case simply because the Supreme Court has favored a liberal application of the LHWCA provisions. We agree with the Third Circuit, which stated:

> The line which Congress intended to draw was between maritime commerce and land commerce, and the coverage of the [LHWCA] starts at the point where the cargo passes to or from an employer engaged in the former to an employer engaged in the latter....

*Sea–Land Serv., Inc. v. Director, Office of Workers' Compensation Programs, etc.*, 540 F.2d 629, 639 (3d Cir.1976). Even though the Supreme Court has called for a liberal interpretation of what constitutes "maritime employment," the Court has not extended coverage to all workers located on the "maritime" situs. It has limited coverage only to workers whose duties involve an "essential and integral part" of the loading process. *Schwalb*, 493 U.S. at 46, 110 S.Ct. at 385. When it amended the LHWCA, Congress

> did not see itself as including under the Act whole new groups and classes of employees. Coverage was still to be geared only to persons who loaded and unloaded vessels (or else repaired or built them) and who fit such traditional maritime designations as longshoreman, harborworker, and the like.

*Stockman v. John T. Clark Son of Boston, Inc.*, 539 F.2d 264, 276 (1st Cir.1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1092 (1977). Thus, to apply the "integral relation" test of "maritime em-

---

**2.** "The distinction between loading ships—clearly within the ambit of the LHWCA—and unloading railroad cars is ... 'purely semantic.' The

coverage under LHWCA cannot turn on such gossamer strands." *Harmon v. Baltimore & O. R.R.*, 741 F.2d 1398, 1401 (D.C.Cir.1984).

ployment" in an excessively broad way that would necessarily encompass any and all workers on the situs, directly conflicts with Congressional intent as stated in the Congressional history and as interpreted by the Supreme Court.

The Supreme Court has expressly recognized that the concept of "maritime employment" on the covered situs requires that a line be drawn between those workers whose duties are justly described as "maritime" in nature, and those whose duties relate to overland transportation. The Court has refused to extend coverage to all workers present at the situs, stating that it is clear Congress wanted to cover "persons whose employment is such that they spend at least some of their time in indisputably longshoring operations and who, without the 1972 Amendments, would be covered for only part of their activity." *Caputo*, 432 U.S. at 273, 97 S.Ct. at 2362. "[P]ersons who are on the situs but are not engaged in the overall process of loading and unloading vessels are not covered." *Id.* at 267, 97 S.Ct. at 2359.

Not surprisingly, we have found no case in which a court has found that a railroad worker (or, as in this instance, a locomotive engineer) whose duties involved railroad classification in a railroad yard is held to be a maritime worker under the LHWCA. As the unique facts of each case are presented, the line must be drawn somewhere. We find that common sense dictates that, on the facts of this case, it be drawn where one form of transportation ceases and the other begins. The switchyard crew's duties were part of the first or last stage of the overland railroad shipment of cargo. The crew's duties were the same as they would have been at any other railroad switchyard servicing another type of industry in which railroad cars are loaded and unloaded by another trade, employer, or business entity. Stowers did not participate in the loading or unloading of the ships, or even of the rail cars, and therefore he certainly was not engaged in an "essential or integral" part of the shiploading process. He hauled the rail cars to the docks for dock employees to load or unload, and he hauled them away when dock em-

ployees were finished loading or unloading them. The overland transportation began and ended with the work of Stowers and the switchyard crew. We find that Stowers was not engaged in "maritime employment" for purposes of the LHWCA.

We need not address, therefore, the question whether Stowers was injured at a "maritime situs" or employed by a "maritime employer."

### III.

We REVERSE the district court's grant of summary judgment in favor of ConRail and REMAND for further proceedings pursuant to the FELA.

BAILEY BROWN, Senior Circuit Judge, dissenting.

Because I disagree with the majority's conclusion that Stowers was not engaged in "maritime employment" for purposes of the LHWCA, I respectfully dissent.

In essence, the majority opinion reaches the conclusion that Stowers' claim must be under the FELA and not under the LHWCA because, following the Fourth Circuit's holding in *Conti v. Norfolk & Western Ry.*, 566 F.2d 890 (4th Cir.1977), Stowers' work was not "traditionally maritime" and instead was "unloading of a coal train, not loading a vessel." Op. at 296. The majority opinion correctly recognizes that the more recent opinion of the District of Columbia Circuit in *Harmon v. Baltimore & Ohio R.R.*, 741 F.2d 1398 (D.C.Cir.1984), squarely supports the decision of the district court in the instant case and expressly disagrees with the holding of the Fourth Circuit in *Conti.*

It is undisputed that the Harbor Yard's role was to receive cars loaded with coal from the mines (in an area of the Harbor Yard called the "Bridge Yard") brought in by railroad over-the-road crews. The loaded cars were then moved by a Harbor Yard locomotive operated by a yard engineer such as Stowers, and were spotted by the engineer in a dumper located on the coal dock bordering the Ashtabula River. These loaded cars were then lifted and

dumped by the dock crew and the coal was moved into the ship by a conveyor belt. After the cars were emptied and placed back on the track, the yard engineer would then move them to another part of the Harbor Yard (the "back track") where the damaged cars were "bad ordered" and the non-damaged cars were made into a train which over-the-road crews would take away.[1] Stowers was injured when his engine derailed while moving empty coal cars from the dock area to the "back track" in Harbor Yard where damaged cars were to be "bad ordered" and the remainder placed to be picked up by an over-the-road crew.

I believe that Stowers' injury is covered by the LHWCA because his work was "essential to the loading or unloading process ...," *Chesapeake & Ohio R.R. v. Schwalb*, 493 U.S. 40, 47, 110 S.Ct. 381, 385, 107 L.Ed.2d 278 (1989), and the injury occurred on a maritime situs. Certainly Stowers would have been covered by the LHWCA if he had been injured while spotting a full coal car in the dumper or while removing an empty car from the dumper because he would then have been a part of the loading crew. If Stowers was covered when actually participating in the loading process, he would also be covered while moving empty cars in Harbor Yard away from the loading process because a primary purpose of the 1972 amendments was to do away with the phenomenon of employees who, in performing their duties, moved in and out of coverage under the LHWCA. *P.C. Pfeiffer Company v. Ford*, 444 U.S. 69, 75–76, 100 S.Ct. 328, 333, 62 L.Ed.2d 225 (1979).

Accordingly, it is clear that Stowers was a "maritime employee" within the meaning of the LHWCA. This is all the more certain when one recognizes, as does the majority opinion, citing *Schwalb*, 493 U.S. at 46, 110 S.Ct. at 385, that the legislative history of the 1972 amendments shows that Congress intended the LHWCA to be liberally construed in favor of coverage.

While the majority opinion does not deal with Stowers' contention that his injury does not satisfy the "situs" requirement of the LHWCA because he was injured on the

"back track" in Harbor Yard, it is clear that this part of Harbor Yard was part of the situs since the act defines situs to include a "marine railway." 33 U.S.C. § 902(4) (1988). Certainly, Harbor Yard, adjoining and serving only those docks on Ashtabula River, is a "marine railway."

While the majority opinion states that it is consistent with the opinion of this court in *Warren Bros. v. Nelson*, 635 F.2d 552 (6th Cir.1980), I disagree. Indeed, *Warren Bros.* actually supports my position. In *Warren Bros.*, the employee, a truck driver, was injured while moving gravel, which had been unloaded from barges into a hopper on a floating platform, to a nearby plant. The gravel had been unloaded from the barge and had then been picked up by the truck driver after which he suffered his injury. This court held that the truck driver was covered by the LHWCA.

I understand the majority opinion to agree that if Stowers were a "maritime employee," Conrail would be his "maritime employer." Since, in my opinion, he was a "maritime employee," Conrail was a "maritime employer."

I would therefore affirm the decision of the district court which held that Stowers' exclusive remedy is under the LHWCA.

---

1. It appears that the Harbor Yard also serviced a dock on the river where ore was unloaded into empty cars which were moved by yard engineers from the dock into the Harbor Yard where they were picked up by over-the-road crews.