

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-11-1998

# Nelson v. Amer Dredging Co

Precedential or Non-Precedential:

Docket 96-3724

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Nelson v. Amer Dredging Co" (1998). *1998 Decisions.* Paper 106.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/106

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 11, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-3724

JOSH NELSON,
        Petitioner

v.

AMERICAN DREDGING COMPANY
and SIGNAL MUTUAL INSURANCE CO.

Appeal from the Decision of the
Benefits Review Board
BRB No. 96-0360
ALJ No. 94-LHCA-3277
OWCP No. 03-0025285

Argued: November 6, 1997

Before: BECKER, Chief Judge, ROTH, Circuit Judge and
DIAMOND,1 District Judge

(Opinion Filed: May 11, 1998)

        David M. Linker, Esquire
          (ARGUED)
        Freedman and Lorry, P.C.

        400 Market Street
        Suite 900
        Philadelphia, PA 19106
         Attorney for Petitioner
_____

1. Honorable Gustave Diamond, Senior United States District Judge for
the Western District of Pennsylvania, sitting by designation.

Francis M. Womack, III,
 Esquire (ARGUED)
Weber Goldstein Greenburg
 & Gallagher
One Evertrust Plaza
9th Floor
Jersey City, NJ 07032
 Attorney for Respondents

OPINION OF THE COURT

DIAMOND, District Judge.

Claimant/petitioner, Josh Nelson, was injured in the
course of his employment with respondent/appellee,
American Dredging Company ("ADC"), and filed a claim for
compensation under the Longshore and Harborworkers
Compensation Act ("Act"), 33 U.S.C. S901 et seq. (1986).
ADC contested the claim on the ground that Nelson's injury
was not covered by the Act. After a hearing, the
Administrative Law Judge ("ALJ") held that the Act did not
cover Nelson's injury and denied compensation. The
Benefits Review Board ("Board") affirmed the ALJ's decision,
and Nelson appealed to this court pursuant to 33 U.S.C.
S921(c).

The decision of the ALJ affirmed by the Board included
the denial of Nelson's motion to enforce a settlement
agreement, the rejection of his contention that ADC had
waived its right to challenge coverage under the Act, and a
ruling that Nelson's injuries were not covered by the Act.
We will affirm the Board's affirmance of the ALJ's refusal to
enforce the alleged settlement agreement and his rejection
of Nelson's contention that ADC had waived its right to
challenge coverage under the Act; however, we will reverse
and remand the Board's affirmance of the ruling that
Nelson's injuries were not covered under the Act.

Background Facts and Procedural History

The operative facts in this matter are not in dispute. The
American Dredging Company was a marine contractor

2

whose business operations included the renourishment/ reclamation of beaches to repair erosion and storm damage and to prevent such damage in the future. Josh Nelson was employed by ADC as an assistant foreman/bulldozer operator.

On September 1, 1992, Nelson was injured as the result of a work-related accident. At the time of the accident, he was working on a beach reclamation project ("project") which ADC had been performing for about two months on Fenwick Island, Delaware, under a contract with the state of Delaware. The project consisted essentially of widening the beach by adding sand to it. The sand was obtained from the ocean floor approximately ten miles from the beach by a hopper dredge, a self-propelled vessel named Atlantic American. The sand was deposited in the hold of the vessel which then transported it to a mooring buoy located several hundred yards from the beach where ADC had constructed an underwater pipeline to the beach. The sand in a slurry form was unloaded from the vessel and deposited on the beach by pumping it through this pipeline.[2]

_____

2. ADC's vice-president of finance described this operation as follows:

> A. The hop... this picture here on page six is the hopper dredge with pipeline attached to what we call a mooring buoy. The mooring buoy is the vehicle by which the pipeline runs from the buoy to the shore and along the shore. The dredge goes into the ocean, to what we call the borrow area, which is an area that's identified by the government that has the type and nature of sand that they wish to put on the beach, and in effect, with drag heads and suction pumps, suck[s] this sand off the ocean floor and into the hopper. This hopper contains 4,000 cubic yards of sand when it's filled. After it fills that, it then sails from the borrow area to the buoy and attaches a flexible pipeline to the barge ...

> Q. Could you show the Judge?

> A. [Referring to a photo in evidence] This is the buoy, and this is the dredge, and this is the pipeline. It attaches this pipeline to its pumps and then in effect pumps the sand out of the hopper through the pipeline and along to the beach through an underwater pipe. The reason this dredge is used in this particular case is because the borrow area is farther away from

3

The flow of the sand through the pipeline and its distribution on the beach were controlled by moving the pipeline along the beach, by adding sections thereto, and by a system of valves on the pipeline. The final distribution and grading of the sand were done with a bulldozer. ADC was paid for this project on the basis of the number of cubic yards of sand added to the beach.

Nelson operated the bulldozer, which he used not only to distribute and grade the sand on the beach but also to maneuver and otherwise work the pipeline as it unloaded the sand from the hopper dredge. It was his job to move the pipeline from place to place along the beach, add sections to it, and manipulate the valves to facilitate the unloading process. This required him to operate the bulldozer in the ocean waters and frequently to work knee deep in those waters on the pipeline. Nelson was supervised by a foreman on the beach who in turn was supervised by a foreman located on the dredge with whom communications were maintained by radio. The accident which gave rise to this suit occurred when Nelson, who was operating his bulldozer on the beach about fifty feet from the water's edge, slipped and fell as he was dismounting the machine in order to change a pipeline valve.

At all times relevant to this case, the hopper dredge was in the navigable waters of the Atlantic Ocean off of Fenwick Island beach. The beach was used solely for recreational purposes; there were no docks, wharves, piers or other such structures on which vessels could berth on or near it.

Following Nelson's injury, ADC filed a report of injury under the Act, acknowledging (1) that the injury occurred during the course of Nelson's employment and (2) that the

_____

the shore than the pipeline length would allow. The long -- you know, if it is ten miles away, you can't pump ten miles, so you go with a hopper dredge out ten miles, and fill it with sand and bring it in. This distance is probably several hundred yards.

Q. Indicating from the buoy to the shoreline.

A. To the shoreline.

App. 98-99.

nature of ADC's business was "marine contractor." ADC voluntarily paid benefits under the Act from October 1992 until June 1993 when a dispute arose as to the nature and extent of Nelson's disability, and, with the exception of a period between November 8 and December 14, 1993, compensation was terminated pending an impartial medical examination.

After his benefits were terminated, Nelson filed a claim under the Act, and when the parties were unable to resolve their differences during an informal reconciliation process, a formal hearing before an ALJ was requested.

At the hearing before an ALJ on January 13, 1995, Nelson's counsel appeared and informed the ALJ that the parties had reached "an agreement in principle," and that a stipulation pursuant to S8(i) of the Act, 33 U.S.C. S908(i)(1), would be forthcoming once certain matters were resolved. He indicated that these matters included the specific amounts of outstanding welfare liens, medical bills which were paid and had to be reimbursed, and the allocation of attorney's fees. Nelson's counsel also explained to the ALJ that Nelson and counsel for ADC were not present at the hearing because the agreement in principle had been reached, but that the parties still were in the process of working out the details of the agreement and they needed 45 days to complete the stipulation and submit it for the ALJ's consideration. A non-lawyer representative of the respondent insurance carrier was present and concurred in the statements made by the Nelson's attorney. After a brief colloquy with Nelson's counsel wherein the general provisions of the contemplated settlement were summarized, the ALJ postponed further proceedings for 45 days to provide the parties with time to submit aS8(i) application for settlement.

Nelson's counsel subsequently forwarded a proposedS8(i) stipulation to counsel for ADC who then notified the ALJ that a settlement had not been reached, because, inter alia, there had been no agreement concerning ADC's responsibility for past and future medical expenses. Nelson filed a motion to enforce settlement and attached a copy of the unexecuted S8(i) stipulation, but the ALJ entered an

5

order denying the motion and scheduling a formal hearing for April 27, 1995.

Following the April 27 hearing, ADC moved for judgment on the ground that Nelson had failed to satisfy the requirements for coverage under the Act. Nelson responded that he had met the coverage requirements and further that ADC had waived the issue of coverage by paying benefits under the Act and failing to raise this issue at the informal level before the District Director.

On November 9, 1995, the ALJ rendered a decision denying Nelson's claim for benefits on the sole ground that he had failed to satisfy the requirements for coverage under the Act.

Nelson appealed to the Board, which affirmed the ALJ as indicated supra.

Standard of Review

This court has appellate jurisdiction pursuant to 33 U.S.C. S921(c). The standard of review is "limited to a determination of whether the Board acted in conformance with applicable law and within its proper scope of review." Sea-Land Service, Inc. v. Rock, 953 F.2d 56, 59 (3d Cir. 1992) (quoting Curtis v. Schlumberger Offshore Service, Inc., 849 F.2d 805, 807 (3d Cir. 1988)). "When factual findings are at issue, we ... make an independent factual review to determine whether the Administrative Law Judge's findings were supported by substantial evidence ...." Id. (citing Janusziewicz v. Sun Shipbuilding & Dry Dock Co., 677 F.2d 286, 290 (3d Cir. 1982)).

Discussion

The Settlement Agreement and Waiver Issues

Nelson's contention that the Board erred in affirming the ALJ's refusal to enforce the alleged settlement agreement and his rejection of Nelson's contention that ADC waived its right to challenge coverage are without merit.

6

In ruling on the ALJ's refusal to enforce settlement, in addition to finding several fatal procedural defects in Nelson's petition for review before the Board, the Board found that the ALJ committed no error since the record was devoid of evidence of a completed settlement agreement between the parties and further because no settlement application had been submitted to the ALJ in accordance with the regulations found in 20 C.F.R. SS702.241-702.243. Nelson v. American Dredging Company and Signal Mutual Insurance Company, 30 BRBS 205, 208 (1996).

20 C.F.R. S702.243(a) provides in its pertinent part:

> (a) When the parties to a claim for compensation ... agree to a settlement they shall submit a complete application to the adjudicator ["district director or administrative law judge (ALJ)" S702.241]. The application shall include all of the information outlined in S702.242 ....

Section 702.242(a) and (b) of the regulations provide in their pertinent parts:

> (a) The settlement application shall be a self-sufficient document which can be evaluated without further reference to the administrative file. The application shall be in the form of a stipulation signed by all parties ....

> (b) The settlement application shall contain the following:

> (1) A full description of the terms of the settlement which clearly indicates, where appropriate, the amounts to be paid for compensation, medical benefits, survivor benefits and representative's fees which shall be itemized as required by S702.132.

20 C.F.R. S702.242(a), (b)(1).

No such application ever was filed with the ALJ. Nelson argues, nevertheless, that the record demonstrates that an enforceable agreement had been reached by the parties, and, referring to rulings of this court which recognize a federal district court's equitable jurisdiction to enforce settlement agreements based upon oral representations

7

made by the litigants before it, urges this court to adopt a similar rule under the Act. See generally Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir. 1970); Good v. Pennsylvania Railroad Co., 384 F.2d 989, 990 (3d Cir. 1967).

The Board was correct in affirming the ALJ. The applicable regulations cited by the Board in its ruling prescribe in detail the procedures for, and the necessary contents of, settlement applications under the Act. The parties never complied with these regulations. In view of the detailed requirements and formal procedures specified in the regulations promulgated under the Act for effectuating a settlement, a serious question arises as to whether under any circumstances an adjudicator or a court properly may enforce a settlement agreement which does not comply with those regulations. We need not resolve that question at this time, however, because the parties never reached a settlement agreement. There was at most an "agreement in principle" to settle, which never matured.

Nelson's counsel at the January 13, 1995, hearing stated only that the parties had "reached an agreement in principle to resolve this case." He advised the ALJ that there were details to be worked out and requested 45 days within which to accomplish this and to provide the ALJ with an appropriate S8(i) stipulation of settlement. The areas upon which final agreement had not been reached were quite material and included the amount of outstanding liens in addition to such items specifically required by 20 C.F.R. S702.242(b)(1), supra, as the apportionment of medical expenses and the amount of the attorney's fees which Nelson would be required to bear.

When asked by the ALJ to elaborate on his assertion that the parties had reached an "agreement in principle," counsel for Nelson stated:

> No. We reached an agreement as to the amount of the money that's going to be in the 8(i). When I say "principle," the only issue we haven't discussed which is complete discussion (sic) is attorney fee thing as to how we're going to handle that. But we have a consensus on that. But Mr. Womack [counsel for ADC]

8

> doesn't have the authority yet on that from Signal
> [ADC's insurance carrier and a co-respondent in this
> case].
>
> The person who he's dealing with is not in town.
>
> I've spoken to my client generally about the format of
> the agreement, and I told him I can't (sic) him a sum
> certain because I don't have the printout from welfare.
> And they've told me to get a current medical printout.
>
> It will take about two weeks. But he's agreeable to the
> format that we have worked out, and the Claimant will
> not bring any other claims under any other acts.

App. 14-15 (emphasis supplied).

These were material matters under the Act. As a result of
their omission, it is obvious that the parties had not arrived
at a settlement agreement by January 13, 1995, but,
indeed, only at "an agreement in principle" to settle. This
never was consummated, and as a consequence there was
no settlement agreement, formal or informal, for the ALJ to
enforce.

Little need be said on the waiver issue. Nelson was well
aware at least as early as the January 13, 1995, hearing,
a full three months prior to the final hearing on April 27,
1995, that ADC was raising coverage questions. In fact,
counsel for Nelson cited the "jurisdictional" issue as one of
his reasons for recommending to his client that the case be
settled on an S8(i) basis. At the hearing counsel for Nelson
stated:

> There are serious questions in this case of jurisdiction
> and extent of disability. And --
>
> Judge Romano: Jurisdiction under the Longshore Act
> you mean?
>
> Mr. Linker: Yes. It was not raised by the employer at
> the informal level, but it is being raised now. It's a
> serious -- in my view, it's a serious question in this
> case. And under the circumstances, we have
> recommended to the Claimant and Claimant's --
> referred counsel to us that the matter be resolved on
> an 8(i) basis.

9

App. 15.

In affirming the ALJ, the Board found that the coverage issue had been timely raised and properly considered by the ALJ. See 30 BRBS at 206. We agree. See 20 C.F.R. S702.336(a) and S702.317, cited by the Board in support of its rulings.

I. The Coverage Issue

We proceed now to address the principal issue in this case; i.e., whether Nelson's injuries are covered by the Act.

The Applicable Law

Prior to 1972, coverage existed under the Act only for injuries sustained upon the "navigable waters of the United States (including any ... dry dock ...)." 33 U.S.C. S903 (1970 ed.). In 1972, Congress amended the Act and imposed a two-part test which looks to "both the `situs' of the injury and the `status' of the injured" to determine eligibility for compensation. Northeast Marine Terminal Co., Inc. v. Caputo, 432 U.S. 249, 265 (1977).

The situs requirement was expanded by an amendment to provide:

> ... Compensation shall be payable under this Act in respect of disability or death of an employee, but only if a disability or death results from an injury occurring upon navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

33 U.S.C. S903(a).

In conjunction with the expanded definition of situs, Congress enacted a so-called "status" requirement and thus restricted coverage for disability under the Act to employees, defined as persons engaged in "maritime employment." Caputo, 432 U.S. at 264. The pertinent amendment provides:

10

> The term "employee" means any person engaged in
> maritime employment, including any longshoreman or
> other person engaged in longshoring operations and
> any harbor-worker including a ship repairman,
> shipbuilder and shipbreaker ....

33 U.S.C. S902(3). Finally, the term "employer" was defined:

> The term "employer" means an employer any of
> whose employees are employed in maritime
> employment, in whole or in part, upon the navigable
> waters of the United States (including any adjoining
> pier, wharf, dry dock, terminal, building way, marine
> railway, or other adjoining area customarily used by an
> employer in loading, unloading, repairing, or building a
> vessel).

33 U.S.C. S902(4).

The 1972 amendments thus broadened the scope of the
geographic requirement under the Act and at the same time
imposed an occupational requirement, each of which has a
distinct and consistent meaning. P.C. Pfeiffer Co., Inc. v.
Ford, 444 U.S. 69, 78 (1979). This court has noted that
although Congress did partially identify the scope of
maritime employment as "including a longshoreman or
other person engaged in such operations and any harbor-
worker such as a ship repairman, shipbuilder, and ship-
breaker, the scope of `maritime employment' [remains] ...
imprecise." Sea-Land Service, 953 F.2d at 60 (citing 33
U.S.C. S902(3)).

While the statutory definition is somewhat imprecise, the
Court has held that the scope of maritime employment
clearly includes those employees "on the situs involved in
the essential or integral elements of the loading or
unloading process." Chesapeake and Ohio Ry. Co. v.
Schwalb, 493 U.S. 40, 46 (1989). The Supreme Court
repeatedly has emphasized that the broad language
employed in the 1972 amendments indicates that an
expansive view of the legislation is appropriate. In Caputo,
the Court observed:

> The language of the 1972 amendments is broad and
> suggests that we should take an expansive view of the

11

extended coverage. Indeed, such a construction is appropriate for this remedial legislation. The Act "must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." Voris v. Eikel, 346 U.S. 328, 333, 98 L.Ed. 5, 74 S.Ct. 88 (1953).

Id., 432 U.S. at 268. See also Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor v. Perini North River Associates, 459 U.S. 297, 315-16 (1983).

II. The Situs Test

The ALJ ruled that Nelson did not satisfy the situs test. He first found that Nelson was not actually on navigable water at the time of his injury and then proceeded to find that the actual situs of the injury, the beach at Fenwick Island, neither adjoined navigable waters nor was used in any way to facilitate or further maritime commerce or transportation. In arriving at this conclusion, he applied the factors which the court in Brady-Hamilton Stevedore Co. v. Herron, 568 F.2d 137, 141 (9th Cir. 1978), held should be considered in determining if the site of an injury, which did not occur on navigable water as such, qualified as an "adjoining area" under the Act. He also deemed it significant that there were no piers, bulkheads, or other facilities on the beach where vessels could berth or where loading, unloading or any other activity incidental to commerce or shipbuilding could have occurred and thus concluded that the beach was only a "natural" or "recreational area."

All of this led the ALJ to rule that the site "was not, and could not be, used for any maritime purpose" and that therefore it failed the "situs test under S3(a) of the Act."

In affirming the ALJ, the Board stated:

> We affirm the Administrative Law Judge's finding that claimant was not injured on a covered situs. Initially, we note that the site is "adjoining" and "contiguous" to navigable water; it cannot seriously be contended that the Atlantic Ocean off the coast of Delaware is not navigable water or that it is not used for maritime

12

commerce. That an injury occurs in an area adjacent to navigable waters does not end the situs inquiry, as the area must be "customarily used by an employee [sic] for loading, unloading, repairing, dismantling or building a vessel." In this case, the record is devoid of evidence supporting a finding that the site of claimant's injury was used for traditional maritime purposes. Rather, it is uncontroverted that the site of claimant's injury is an unimproved beach fronting the ocean. 2 We, therefore, affirm the ALJ's finding that claimant was not injured on a covered situs.

Nelson, 30 BRBS at 207. [The text of footnote 2 appears below]. Although the Board rejected the ALJ's finding that the Atlantic Ocean at Fenwick Island was not a navigable water way and that it was not used for maritime commerce, it nevertheless found that the area did not qualify as a S3(a) situs. It reasoned that not only must the area be adjacent to navigable waters but it also must be "customarily used by an employee [sic] for loading, unloading, repairing, dismantling or building a vessel." It then concluded that "[i]n this case, the record is devoid of evidence supporting a finding that the site of claimant's injury was used for traditional maritime purposes. Rather, it is uncontroverted that the site of claimant's injury is an unimproved beach fronting the ocean." Id. The Board further reasoned:

2. Claimant argues that his work involved unloading sand from a dredge, see status discussion, infra, and that the beach thus falls within S3(a) due to the "discharge" of sand from the vessel. Claimant's Brief at 13. We do not agree that the discharge of sand onto the beach makes it an area "customarily" used for unloading a vessel, since the customary use of the beach is recreation. See also Sidwell v. Express Containers Services, Inc., 74 F.3d 1134, 29 BRBS 138 (CRT) (4th Cir. 1995) (an adjoining area must be a "discreet structure or facility, the very raison d'etre of which is its use in connection with navigable waters"). (emphasis added).

Id. at n.2.

We disagree with the Board's rationale and its reading of that portion of S3(a) of the Act. The Board construed the

13

language to mean that the customary use of the beach had to be for some maritime purpose. But the word "customarily" in S3(a) modifies the phrase "adjoining area ... used by an employer," not simply the phrase "adjoining area." The Board's construction would eliminate the phrase "used by an employer" from the amendment so that it would read "or other adjoining area customarily used in loading, unloading, repairing, dismantling or building a vessel." Of course, if that were the language employed by Congress, the Board's conclusion that in order for a site to be an "other adjoining area" covered by the Act, such area must customarily be used, in effect, by the maritime industry for some maritime purpose would be more tenable. But the dispositive question in S3(a) is not whether the beach "customarily is used" for "loading, unloading ..." but rather whether "an employer customarily" uses the beach for loading, unloading ...."

ADC is a maritime employer within the meaning of the Act. It is in the business of dredging channels and reclaiming beaches. A fair reading of the uncontradicted testimony of Nelson and of ADC's chief financial officer at the April 27, 1995, hearing, the only witnesses who testified, supports the following: ADC performed a number of these beach reclamation projects, and thus was in the beach reclamation business. The Fenwick Island project was typical in that the sand used to rebuild the beach had to be obtained from a "borrow" area from thefloor of the ocean at a point which was beyond the reach of the pipeline which ADC used to pump this sand onto the beach being reclaimed. Therefore, ADC employed a hopper dredge to dredge the sand from the borrow area and to load it into the hopper of the dredge vessel which then transported the sand to the pipeline. The sand then was pumped from the hopper dredge through the pipeline and unloaded onto the beach. The Fenwick Island beach was an area contiguous to navigable waters. And it and similar beaches customarily were used by ADC, an employer, to unload its hopper dredge vessel. In fact, this had been done on this job for approximately two months prior to the time when Nelson was injured.

14

Based on the foregoing, we believe that the beach at Fenwick Island qualified as an adjoining area customarily used by at least one maritime employer to unload its vessel.

The Board, however, cites Sidwell v. Express Containers Services, Inc., 71 F.3d 1134 (4th Cir. 1995), cert. denied, ___ U.S. ___, 116 S.Ct. 2570 (1996), for the proposition that in order for an adjoining area to qualify as a situs it "... must be a `discrete structure or facility', ...." It is true that the court in Sidwell, applying the canon of statutory construction noscitur a sociis, concluded that the "other adjoining area" referred to in S3(a) must be like the so-called areas which are listed in that section; i.e.,"... any adjoining pier, wharf, dry dock, terminal, building way, marine railway ...," each of which, with the possible exception of the building way, the court found to be a "discrete structure or facility." Sidwell, 71 F.3d at 1139.

We respectfully decline to adopt this construction of the statute. The structures identified in S3(a) which preceded the phrase "other adjoining area" were not referred to in that section as "areas." The Sidwell court opined that by using the term "other adjoining area" the drafters of the amendment thereby were referring back to the enumerated structures; i.e., pier, wharf, dry dock, as areas. But giving the word "area" its plain meaning as we are required to do in construing the statute,3 wefind that it does not denote

_____

3. The Supreme Court recently referred to this rule of statutory construction in Robinson v. Shell Oil Co., 519 U.S. ___, 117 S.Ct. ___, 136 L.Ed.2d 808 (1997):

> Our first step in interpreting a statute is to determine whether the
> language at issue has a plain and unambiguous meaning with
> regard to the particular dispute in the case. Our inquiry must cease
> if the statutory language is unambiguous and "the statutory scheme
> is coherent and consistent." United States v. Ron Pair Enterprises,
> Inc., 489 U.S. 235, 240, 103 L.Ed.2d 290, 109 S.Ct. 1026 (1989);
> see also Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253-254,
> 117 L.Ed.2d 391, 112 S.Ct. 1146 (1992).
>
> The plainness or ambiguity of statutory language is determined by
> reference to the language itself, the specific context in which that
> language is used, and the broader context of the statute as a whole.
> Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477, 120
> L.Ed.2d 379, 112 S.Ct. 2589 (1992); McCarthy v. Bronson, 500 U.S.
> 136, 139, 114 L.Ed.2d 194, 111 S.Ct. 1737 (1991).

Robinson, 519 U.S. ___, 136 L.Ed.2d at 813.

a building or structure as such, but rather an open space, indeed sometimes within a building or other structure.

Webster's Third New International Dictionary (1993) at p. 115 defines "area" as:

> a piece of level ground, a level or relatively level piece of unoccupied or unused ground; ... a clear or open space of land; ... a definitely bounded piece of ground set aside for a specific use or purpose; ... the enclosed space or site on which a building stands; ... a clear or open space within a building; .. a definitely bounded part or section of a building set aside for a specific use or purpose; ... any particular extent of space or surface. (emphasis supplied).

The American Heritage Dictionary of the English Language (1976) at p. 69 similarly defines "area" as:

> 1. A flat, open, or unoccupied piece of ground. 2. A part of the earth's surface; region. 3. A distinct part or section, as of a building, set aside for a specific function .... 4. The range or scope of anything: the whole area of finance. 5. The yard of a building; an areaway ....

There is nothing in the definition of the word "area," therefore, which suggests that by its use in S3(a) the drafters intended that it refer back to and be modified by any of the preceding enumerated sites which happen to be structures. Contrary to the Board's holding, an unimproved beach falls within the plain meaning of the word "area" as defined above.

In addition, we find it to be inconsistent with the remedial purpose of the 1972 amendments of the Act and the liberal construction they are to be given to conclude that Congress intended by this indirect means to provide coverage under the Act only for injuries which occur on certain definable structures. Instead, it is more consistent with that purpose and "the broader context of the statute as a whole," Robinson, 519 U.S. at ___, 136 L.Ed.2d at 813, to conclude that Congress intended primarily by this language to ensure that the area where an injury occurs be on or adjacent to navigable waters.

16

Accordingly, we hold that under the facts and circumstances of this case the beach at Fenwick Island constituted an adjoining area where ADC customarily unloaded (sand from) its vessels. As such it constituted a covered maritime situs under the Act.

III. The Status Requirement

The ALJ also found that Nelson did not satisfy the status requirement. In the words of the ALJ, Nelson

> was employed as a bulldozer operator on a beach renourishment project. The purpose of the project was to put sand on the beach area. It had nothing whatsoever to do with maritime commerce or the construction or repair of vessels. Nelson's work was not maritime in nature. His job was to move material (sand and pipes) with a bulldozer. It was not related to maritime commerce.

App. 156.

In affirming the ALJ, the Board rejected Nelson's argument that a considerable and important aspect of his job activity had to do with unloading sand from the dredge vessel, Atlantic American. It held:

> Despite claimant's attempts to characterize his bulldozing activity as integral to the unloading process, we agree with the Administrative Law Judge that the bulldozing activities performed by claimant for employer in this case involved the movement of sand as part of the process of rebuilding the beach, rather than maritime commerce. Inasmuch as claimant's bulldozing duties were integral to employer's beach renourishment project rather than longshoring activities, we affirm the Administrative Law Judge's determination that these duties are insufficient to confer coverage under the Act. See Caputo, 432 U.S. at 249, 6 BRBS at 150; Schwalb, 493 U.S. at 40, 23 BRBS at 96 (CRT); Garmon v. Aluminum Company of America–Mobil Works, 28 BRBS 46, 49 (1994). (emphasis added).

We do not subscribe to this reasoning. It is undisputed that the hopper dredge on the Fenwick Island project

17

obtained sand from the ocean floor approximately 10 miles from Fenwick Island beach. Approximately 4,000 cubic yards of sand at a time were loaded into the hold of the vessel. At this point that sand literally became the "load" being carried by that vessel. When this self-propelled vessel then transported its load a distance of 9 miles on the Atlantic Ocean to the pipeline buoy, that ship was in maritime commerce, and we would add, as much so as it would have been had it transported its load of sand from Myrtle Beach, South Carolina. When that load was transferred from the hopper dredge onto the Fenwick Island beach by pumping it through the pipeline, it literally was "unloaded" as much as it would have been had it been bagged and removed from the vessel by a crane and cargo nets.

From the undisputed facts it is clear that Nelson was a vital part of the unloading process. With the aid of his bulldozer he moved the pipeline up and down the beach in order strategically to deposit; i.e., to unload, the sand; he waded knee deep into the ocean waters to adjust valves and add sections to the pipeline; and finally he moved the sand from where it was pumped in those waters adjacent to the beach to the shore and then graded the sand on the beach with his bulldozer. Even if we assume arguendo that this final grading was not an integral part of the unloading process, but, instead was part of the process of rebuilding the beach, it is abundantly clear that in all other respects Nelson was directly and intimately involved in unloading the hopper vessel. This was more than enough to constitute maritime employment.[4]

The fact that all of this was done in connection with, and for the ultimate purpose of, the renourishing of a beach is wholly irrelevant to a determination of the nature of the work which was being done by Nelson. There is no basis in the case law or logical reasoning to support the proposition

_____

4. It is sufficient that Nelson "spen[t] `at least some of [his] time in indisputably longshoring operations.' " Pfeiffer, 444 U.S. at 75. Maritime employment clearly includes employees "involved in the essential or integral elements of the loading or unloading process." Schwalb, 493 U.S. 46 (1989).

18

that what otherwise would constitute the act of unloading a vessel becomes a non-unloading, and thus a non-covered, act because of the ultimate use to which the product being unloaded is put. Neither Caputo nor Schwalb nor Garmon cited by the Board in support of this concept, does so.

In Garmon, the claimant's employer manufactured aluminum. The employer had a building where it stored bauxite and from which it drew this aluminum ore as it was needed in the manufacturing process. The bauxite was transported by ship to state-owned docks where state employees unloaded it and ultimately delivered it to the floor of the storage building, where it was stored by claimant's employer for up to three months until it was needed in the manufacturing process. Claimant was a bulldozer operator employed by the aluminum manufacturer. His job was to bulldoze into piles the bauxite previously deposited on the floor of his employer's storage building by state employees where it was held until ultimately it was transferred within the employer's manufacturing facility for use in the manufacturing process. Under those facts, an ALJ held that the claimant was not engaged in the unloading process because his "operating duties were not necessitated by unloading operations but by employer's use of bauxite in the process of manufacturing aluminum." On appeal the Benefits Review Board affirmed, concluding "... claimant's bulldozing duties were integral to employer's manufacturing process rather than to longshoring activities ...."

The critical factual differences between Garmon's and Nelson's activities are too obvious to require analysis beyond noting that Garmon's duties commenced after the state employees had completed the unloading of the bauxite and had delivered it to Garmon's employer. Nelson, on the other hand, was at the exit end of a pipeline contemporaneously performing functions essential to the unloading of sand from a vessel by this pipeline.

It is significant, moreover, that the Board in Garmon remanded the case for the ALJ to address the contention that claimant's duties in cleaning the employer's conveyor belts and retrieving bauxite from the floor and returning it to those belts were part of the unloading process, stating

19

that "[t]he Supreme Court has held that the status test focuses on claimant's overall duties; thus, an employee is covered under the Act if he spends `at least some' of his time in loading and unloading. Caputo, 432 U.S. at 273, 6 BRBS at 165. See also Ford, 444 U.S. at 337, 11 BRBS at 328." Garmon, 28 BRBS at 49.

Garmon thus strongly supports Nelson's position and illustrates precisely the point that all of a claimant's work activities must be considered in determining whether he was engaged in maritime employment.

In Schwalb, the claimants were employees of a railroad working at a terminal where coal was being loaded from railway cars onto ships. The claimants were injured either while cleaning or while repairing equipment that was used in the loading process. The Supreme Court reversed the Supreme Court of Virginia which had held that claimants were not engaged in maritime employment when they were injured. The Court stated at 493 U.S. 47:

> Although we have not previously so held, we are quite sure that employees who are injured while maintaining or repairing equipment essential to the loading or unloading process are covered by the Act. Such employees are engaged in activity that is an integral part of and essential to those overall processes. That is all that S902(3) requires. Coverage is not limited to employees who are denominated "longshoremen" or who physically handle the cargo. ...

Schwalb thus also supports Nelson's position, because he was even more directly involved in the loading/unloading process than were the claimants in Schwalb.

Caputo, supra, also cited by the Board in support of its holding that at the time of his injury Nelson was not engaged in maritime employment, provides scant authority for that ruling. In Caputo the court upheld coverage for a terminal laborer who was injured while rolling a dolly loaded with cheese onto a consignee's truck, the cheese previously having been unloaded from a vessel on navigable waters. The Court also upheld coverage for another claimant who was injured as he was marking the cargo removed from a container which had been unloaded from a

20

vessel. In each instance, the claimant's activities were much more indirect and further removed from the unloading process than were Nelson's.

For the foregoing reasons, we hold that under the facts and circumstances of this case that at the time Nelson was injured he was engaged in maritime employment on a covered situs within the meaning of the Act. The Board's rulings to the contrary were not in conformance with the applicable law; accordingly, we will reverse the Board's ruling with regard to the coverage question and remand it for proceedings consistent with this opinion. In all other respects, the Board's rulings will be affirmed.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit